531 S.E.2d 678

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Donna Jean POLING, Defendant Below, Appellant.**

No. 26568.

Supreme Court of Appeals of West Virginia.

Submitted March 22, 2000.

Decided May 8, 2000.

Dissenting Opinion of Justice Starcher May 8, 2000.

Janet D. Preston, Esquire, Cooper & Preston, Parsons, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Attorney General, Leah Perry Macia, Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

SCOTT, Justice:

The Appellant, Donna Jean Poling, appeals from a final judgment of the Circuit Court of Tucker County, entered on February 5, 1999, upon her conditional plea of guilty to the felony offense of manufacturing a controlled substance, with reservation of her right to appeal under Rule 11(a)(2) of the West Virginia Rules of Criminal Procedure.[1] The Appellant seeks a reversal of the conviction and the right to withdraw her plea based on two pretrial evidentiary rulings by the lower court, which denied her motion to suppress evidence seized under a warrant and precluded presentation of the affirmative defenses of compulsion and medical necessity. Finding no error in the challenged rulings, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 30, 1998, Tucker County Deputy Sheriff Brian Wilfong visited the Appellant's residence for the purpose of serving a subpoena on her husband in a matter unrelated to this case. Deputy Wilfong walked onto the front porch of the house and knocked on the front door. As he waited for someone to come to the door, a window in the top portion of the door was at his eye level. His view through the window was not obstructed by a curtain, shade, or any other form of covering. Through the uncovered window, Deputy Wilfong saw three marijuana plants sitting on a counter located approximately seventeen feet from the door. The plants were illuminated by a fluorescent light and were in Deputy Wilfong's plain sight as he stood at the Appellant's front door. He did not look into any other windows in the residence. When no one came to the door, he left the residence, contacted a magistrate, and obtained a search warrant for the Appellant's home. The search was conducted by Deputy Wilfong and two other law enforcement officers. In the course of the search, eighteen marijuana plants were discovered in addition to the three plants which Deputy Wilfong had seen through the front door window. The twenty-one marijuana plants were photographed, videotaped, and then seized by the officers. Sometime after the plants were seized, the Appellant and her husband arrived home, and Deputy Wilfong took a statement from the Appellant.

The Appellant was arrested the next day and charged with possession with intent to manufacture a controlled substance in violation of West Virginia Code § 60A-4-401 (1997). On May 26, 1998, a preliminary hearing was held, and in June 1998, the Appellant was indicted for manufacturing a controlled substance by growing and cultivating marijuana.

On June 30, 1998, the Appellant filed a pretrial motion to suppress "all evidence seized or otherwise procured by police officers which stems from the illegal search of the Defendants' home...." Following an in camera suppression hearing, the circuit court took the motion to suppress under advisement. By order entered August 26, 1998, the circuit court denied the motion.

Trial was scheduled for February 5, 1999. On January 25, 1999, the State filed a motion in limine seeking to "prohibit any testimony or defense based upon medicinal qualities of marijuana upon multiple sclerosis." The Appellant filed a response to the State's motion in limine and also filed a renewal of her motion to suppress.

On February 5, 1999, the circuit court conducted a hearing on the Appellant's renewed motion to suppress and the State's motion *in limine*. At the hearing, Appellant's counsel offered evidence and argued in

---

1. Rule 11(a)(2) provides:

(2) Conditional Pleas.—With the approval of the court and the consent of the state, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.
W. Va. R.Crim. P. 11(a)(2).

support of the proposed theories of defense (compulsion and medical necessity). The circuit court denied the Appellant's renewed motion to suppress and granted the State's motion in limine. The Appellant then entered a plea of guilty to the felony charge of manufacturing a controlled substance, conditioned on the instant appeal. Upon said plea, the circuit court adjudged the Appellant guilty of manufacturing a controlled substance and sentenced her to one to five years in the state penitentiary. This sentence was suspended, and a five-year term of probation was imposed.

## II. STANDARD OF REVIEW

The standard of review applicable to a circuit court's ruling on a motion to suppress evidence was articulated by this Court in the first and second syllabus points of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996):

1. When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

2. In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.

The standard which governs appellate review of a circuit court's decision to exclude evidence was recited in *State v. Wade*, 200 W.Va. 637, 490 S.E.2d 724, *cert. denied*, 522 U.S. 1003, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997): " '[a]lthough most rulings of a trial court regarding the admission of evidence are reviewed under an abuse of discretion standard, ... an appellate court reviews *de novo* the legal analysis underlying a trial court's decision.' *State v. Guthrie*, 194 W.Va. 657, 680, 461 S.E.2d 163, 186 (1995) (citations omitted)." 200 W.Va. at 652, 490 S.E.2d at 739. It is within the confines of these standards that we review the issues now before us.

## III. DISCUSSION

The Appellant assigns as error the circuit court's denial of her motion to suppress the marijuana plants and other evidence seized as a result of the search of her home. She argues that, by peering into the window of her front door from the vantage point of the front porch, Deputy Wilfong conducted a warrantless search which was per se unreasonable and, therefore, in violation of her Fourth Amendment rights. The Appellant consequently contends that all evidence gained from the search (the marijuana plants, etc.) should have been suppressed. Conversely, the State argues that the lower court correctly admitted the evidence seized from the Appellant's home because it was not the product of an illegal search. Relying on the "open view" doctrine, the State posits that since Deputy Wilfong observed the marijuana plants in plain view from a vantage point that did not infringe on privacy interests, his actions neither constituted a search nor violated the Appellant's Fourth Amendment rights in any way.

At the outset, we observe that there is no question as to the form of the warrant under which the marijuana plants and other evidence were seized. Nor is there any contention that the search conducted under the warrant exceeded its scope. The only issue raised relating to the seizure of evidence from the Appellant's home is whether Deputy Wilfong's observation of marijuana plants through her uncovered front door window amounted to an unjustified warrantless search, which operated to invalidate the search warrant subsequently obtained and

rendered the property seized thereunder inadmissible. We conclude that the said observation was not a search within the meaning of the Fourth Amendment, and consequently, the circuit court committed no error in denying the motion to suppress.

■ This Court has long recognized that "Article III, § 6 of our state constitution[2] and the Fourth Amendment of our federal constitution,[3] protect citizens from unreasonable searches and seizures." *State v. Stone*, 165 W.Va. 266, 269, 268 S.E.2d 50, 53 (1980), *overruled on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). However, as stated in syllabus point four of *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973):

"The State and Federal Constitutions prohibit only unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, such as an automobile in motion, searches made in hot pursuit, searches around the area where an arrest is made, things that are obvious to the senses, and property that has been abandoned, as well as searches and seizures made that have been consented to." Point 1 Syllabus, *State v. Angel*, 154 W.Va. 615 [, 177 S.E.2d 562 (1970) ].

■ In syllabus point three of *State v. Angel*, 154 W.Va. 615, 177 S.E.2d 562 (1970), we described the situation in which a search warrant is not necessary because things are obvious to the senses: "If officers are lawfully present and observe what is then and there immediately apparent, no search warrant is required in such instance, and the testimony by the officers with regard to the evidence which they observed is entirely proper." *Id.* at 616, 177 S.E.2d at 563; *accord* Syl. Pt. 1, *State v. Slaman*, 189 W.Va. 297, 431 S.E.2d 91 (1993). Later, in *State v.*

*Woodson*, 181 W.Va. 325, 382 S.E.2d 519 (1989), we attached the "plain view" label to the situation delineated in *Angel*, stating that "the label 'plain view' . . . applie[s] to a situation where the police officer is present where he has a lawful right to be and sees in plain view an object that constitutes contraband or evidence of a crime." *Woodson*, 181 W.Va. at 330, 382 S.E.2d at 524. Discussing this particular "plain view" situation, we elucidated:

"[T]he concern here is with plain view . . . as descriptive of a situation in which there has been no search at all in the Fourth Amendment sense. This situation . . . encompasses those circumstances in which an observation is made by a police officer without a prior physical intrusion into a constitutionally protected area. . . . ["]

181 W.Va. at 331, 382 S.E.2d at 525 (quoting 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE 322–23 (2d ed.1987)); *see also* Syl. Pt. 3, *Stone*, 165 W.Va. at 266, 268 S.E.2d at 51 ("It is not a search for the police to discover evidence in plain sight. . . .").

■ Based on the above-stated principles, it is clear that the Appellant's assertions regarding a violation of her Fourth Amendment rights are without merit. Deputy Wilfong was lawfully present at the Appellant's front door with the intention of executing the administrative task of serving a subpoena on her husband. As the deputy stood waiting for someone to answer his knock, he merely observed what was immediately apparent, obvious, and in his plain view through the uncovered window. Under these facts, we find there was " 'no search at all in the Fourth Amendment sense.' " *Woodson*, 181 W.Va. at 331, 382 S.E.2d at 525. As explained in *State v. Smith*, 37 N.J. 481, 181 A.2d 761 (1962), *cert. denied*, 374 U.S. 835, 83

**2.** Article III, Section 6 of the West Virginia Constitution provides:

The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.

**3.** The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

S.Ct. 1879, 10 L.Ed.2d 1055 (1963), the Fourth Amendment does not "draw[ ] ... the blinds the occupant could have drawn but did not." 181 A.2d at 769. Our conclusion on this issue is bolstered by numerous decisions from other jurisdictions. *See, e.g., United States v. Taylor,* 90 F.3d 903 (4th Cir.1996) (holding that officer's observations from Appellants' front porch of items clearly visible through picture window located adjacent to front door did not constitute search within meaning of Fourth Amendment); *United States v. Hersh,* 464 F.2d 228 (9th Cir.) (holding that officers' observations through window were not illegal where officers, while standing on Appellant's front porch, merely looked through window located immediately to left of front door), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972); *State v. Dickerson,* 313 N.W.2d 526 (Iowa 1981) (holding that officers, who were engaged in legitimate investigative activities, did not invade defendant's reasonable expectation of privacy by coming to door of his residence, and their visual observations through window in door did not constitute search in the constitutional sense); *State v. Rose,* 128 Wash.2d 388, 909 P.2d 280 (1996) (holding that officer's observations did not constitute illegal search when officer, while standing on front porch of defendant's mobile home, looked with aid of flashlight through unobstructed window to left of front door and saw cut marijuana and scale on table inside).

Implicit in Appellant's argument is the contention that the affidavit of Deputy Wilfong detailing his observation of marijuana plants was insufficient to support the issuance of a search warrant because the information contained in the affidavit was obtained through an illegal search. "To constitute probable cause for the issuance of a search warrant, the affiant must set forth facts indicating the existence of criminal activities which would justify a search...." Syl. Pt. 1, in part, *Stone,* 165 W.Va. at 266, 268 S.E.2d at 51. In *State v. Wotring,* 167 W.Va. 104, 279 S.E.2d 182 (1981), we rejected the appellant's contention that the search of her home pursuant to a warrant was illegal where the supporting affidavit filed by the investigating officer "contained an assertion that the affiant witnessed a drug transaction on the property to be searched." *Id.* at 111, 279 S.E.2d at 188. Our ruling in *Wotring* took into consideration the fact that "the affiant stated that he saw the transaction occur on the appellant's premises," which "g[ave] rise to more than a mere belief that the thing to be seized could be found on the premises." *Id.* at 110, 279 S.E.2d at 187. In the instant case, given that Deputy Wilfong's plain view observation of marijuana plants did not constitute a Fourth Amendment search, his affidavit was clearly sufficient to establish probable cause for the issuance of the search warrant.

The Appellant also assigns as error the absence of any factual findings in the circuit court's order denying her motion to suppress. On August 26, 1998, the circuit court entered an order, which stated summarily that "the motion to suppress the search warrant ... hereby is denied." Although the order does not set forth any factual findings, this Court has never held that the denial of a motion to suppress must be reversed if the circuit court's order does not contain findings of fact. On the contrary, this Court stated in *State v. Lacy,* 196 W.Va. 104, 468 S.E.2d 719 (1996), that "[i]f the circuit court did not make the necessary findings, the matter may either be remanded with appropriate directions or the circuit court's denial of a motion to suppress upheld if there is any reasonable view of the evidence to support it." *Id.* at 110, 468 S.E.2d at 725. Furthermore, the record presented to this Court includes the transcript of a hearing on February 5, 1999, during which the Appellant's renewed motion to suppress was discussed. At that hearing, the circuit court adopted Deputy Wilfong's version of the facts, stating: "I am of the opinion that it happened exactly as the deputy said...." The designated record also includes the transcript of the suppression hearing, during which Deputy Wilfong testified. This evidence permits us to meaningfully review the circuit court's ruling.

The Appellant's third and final assignment of error is that the circuit court improperly granted the State's motion in limine, and thereby foreclosed her presentation of the

affirmative defenses of compulsion and medical necessity. Upon review, we find no error in the preclusion of either of these defenses.

In syllabus point one of *State v. Tanner*, 171 W.Va. 529, 301 S.E.2d 160 (1982), this Court articulated the test for compulsion, proof of which can be found to excuse the commission of a criminal act:

> In general, an act that would otherwise be a crime may be excused if it was done under compulsion or duress, because there is then no criminal intent. The compulsion or coercion that will excuse an otherwise criminal act must be present, imminent, and impending, and such as would induce a well-grounded apprehension of death or serious bodily harm if the criminal act is not done; it must be continuous; and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough.

We stated further in *Tanner* that "[i]f the evidence raised a reasonable doubt about [Appellant's] ... criminal intent to commit the offense charged, [compulsion] ... would be a valid legal defense." *Id.* at 532, 301 S.E.2d at 163.

■ Here, the Appellant failed to proffer sufficient evidence of compulsion, as defined in *Tanner*, to raise a reasonable doubt about her criminal intent to commit the offense of manufacturing a controlled substance. The Appellant argues that the *Tanner* test is satisfied because she

> lives with the present, imminent, continuous, apprehension of serious bodily harm resulting from the disease of multiple sclerosis. She tried all legal, prescription, drugs prescribed to her prior to ever possessing marijuana, with no success. To her, there was no other way to escape the symptoms of her disease other than consuming marijuana.

This argument ignores that it is the compulsion, not the apprehension or fear, which must be present, imminent, impending, and continuous in order to negate criminal intent. Before using marijuana, Appellant "suffered ... from periodic attacks." "[T]wo to three times a year [she would have] an attack of MS that would last ... [for] approximately

three months...." Clearly, these claims do not support the *Tanner* requirements that the "compulsion" be present and continuous, certainly not for the several months necessary to plant, cultivate, and grow marijuana to maturity.

■ Through its ruling on the motion in limine, the circuit court also barred Appellant from presenting the defense of medical necessity. This Court has not previously recognized medical necessity as an affirmative defense, and we decline to do so today. We find persuasive the reasoning in *State v. Williams*, 93 Wash.App. 340, 968 P.2d 26 (1998), *review denied*, 138 Wash.2d 1002, 984 P.2d 1034 (1999); and *State v. Hanson*, 468 N.W.2d 77 (Minn.Ct.App.1991).

The appellant in *Williams* attacked his convictions of unlawful manufacturing of marijuana and unlawful possession of marijuana on the grounds that the trial court erred in excluding expert testimony regarding the medical use of marijuana and in refusing to give a jury instruction on medical necessity. Washington's intermediate appellate court affirmed and held that "the defense of medical necessity is unavailable for drugs that are classified as Schedule I Controlled Substances because the Legislature has conclusively determined that marijuana has no currently accepted medical use in treatment in the United States." 968 P.2d at 28. Elaborating on its rationale, the *Williams* Court stated:

> [T]he decision of whether there is an accepted medical use for particular drugs has been vested in the Legislature by the Washington Constitution. The Legislature has determined that marijuana has no accepted medical use. Williams has no fundamental right to have marijuana as his preferred treatment over the State's objections. Further, if the debate over medical treatment belongs in the political arena, it makes no sense for the courts to fashion a defense whereby jurors weigh experts' testimony on the medical uses of a Schedule I drug. Otherwise, each trial would become a battlefield of experts. But the Legislature has designated the battlefield as the Board of Pharmacy. The Washington

Constitution has not enabled each individual to be the final arbiter of the medicine he is entitled to take—it is the Legislature that has been authorized to make laws to regulate the sale of medicines and drugs.

*Id.* at 30. Moreover, as noted by the court in *Williams,* the decision upon which the Appellant in the case *sub judice* relies as support for the medical necessity defense was implicitly overruled by the Washington Supreme Court's decision in *Seeley v. State,* 132 Wash.2d 776, 940 P.2d 604 (1997). *Williams,* 968 P.2d at 30 (discussing overruling of *State v. Diana,* 24 Wash.App. 908, 604 P.2d 1312 (1979)).

In *Hanson,* the appellant, an epilepsy victim, challenged the trial court's exclusion of the defense of medical necessity in connection with his conviction for manufacturing marijuana. Finding no error in said exclusion, the *Hanson* Court stated that:

a prime feature of this defense as developed elsewhere is a deference to the legislative prerogative to define the criminal offense: "The defense of necessity is available only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values. If it has done so, its decision governs."

468 N.W.2d at 78 (quoting 1 LaFave & Scott, Substantive Criminal Law § 5.4, 631 (1986)). The *Hanson* Court proceeded to outline controlling statutory provisions which had been enacted by the state legislature: "The Minnesota legislature has attached criminal penalties to the possession, sale or cultivation of marijuana. The statutory classification of marijuana as a Schedule I substance implies a determination that marijuana has 'no currently accepted medical use in the United States.'" 468 N.W.2d at 78 (statutory citations omitted); *see also State v. Cramer,* 174 Ariz. 522, 851 P.2d 147, 149 (Ct.App.1992) (holding that trial court did not err in precluding appellant's defense of medical necessity to charge of unlawful production of marijuana because "the Legislature has addressed exceptions and exemptions in detail by statute ... and ... unlawful possession of marijuana does not fall within those protected categories").

■ As we consider the availability of the medical necessity defense in West Virginia, we are mindful that "West Virginia Constitution, Article VI, Section 1, reposes the legislative power in the legislative department," *State v. Grinstead,* 157 W.Va. 1001, 1012, 206 S.E.2d 912, 920 (1974), and the "constitutional powers of the Legislature are particularly broad in matters of health[.]" *Id.* at 1010, 206 S.E.2d at 918. The Uniform Controlled Substances Act, West Virginia Code §§ 60A-1-101 to 60A-9-7 (1997 & Supp.1999), contains the following proviso:

The state board of pharmacy shall recommend to the legislature that a substance be included in Schedule I if it finds that the substance:

(1) Has high potential for abuse; and

(2) Has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision.

W. Va.Code § 60A-2-203. By virtue of its broad constitutional power, and upon the recommendation of the state board of pharmacy, the West Virginia Legislature has designated marijuana as a Schedule I controlled substance. *See* W. Va.Code §§ 60A-2-203, -204(d)(22). In making this classification, the Legislature has adopted the board of pharmacy's determination that marijuana either "has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." W. Va.Code § 60A-2-203. Moreover, the Legislature has imposed criminal penalties upon any person who manufactures, delivers, or possesses with intent to manufacture or deliver, marijuana. The Legislature has made no exception for medical use. Accordingly, we hold that medical necessity is unavailable as an affirmative defense to a marijuana charge in West Virginia because the Legislature has designated marijuana as a Schedule I controlled substance with no exception for medical use.

## IV. CONCLUSION

Upon all of the foregoing, we find no error in the challenged rulings of the circuit court

and, therefore, affirm the February 5, 1999, order of the Circuit Court of Tucker County.

Affirmed.

STARCHER, Justice, dissenting:

(Filed May 8, 2000)

I dissent from the majority opinion because I believe that the circuit court was wrong to deny Donna Jean Poling (and her doctor) the right to tell the jury *why* Ms. Poling was growing marijuana.

It seems clear to me that a criminal defendant should ordinarily always be able to tell the jury *why* the defendant did something that may be a crime—for two basic reasons.

First, it could be that a defendant didn't have the state of mind necessary to make the act that they performed a crime. Suppose that a criminal defendant told the jury: "I drove through the red light because there was a train coming right at me;" or "I shot him because he had beaten me for years and I thought if I didn't, he was about to beat me again;" or "I took the money from her bureau because she had stolen the money from me the week before."

In each case, if a jury believed what the defendant said about *why* they performed the acts, the defendant might not be found guilty of the crime of reckless driving, murder, or theft.

Why not?

Because the defendant did not have the criminal intent, the state of mind, that may be necessary to make the act that they performed into a crime. And, it simply makes no sense, nor is it fair, to not permit a person charged with a criminal offense to explain or tell *why* that person did whatever he or she may have done.

Donna Jean Poling is a 34–year old, married mother of four children who suffers from multiple sclerosis. In her initial statement to the police, given on March 30, 1999, at the conclusion of the search of her home, Donna Poling admitted that she was growing marijuana. In response to the question by Deputy Wilfong, "Can you tell me about the marijuana that was growing in the house?", she replied, "I smoke it because I have M.S., I'm not a drug dealer. I smoke it for medical reasons." Thereafter, there occurred several informal discussions between the prosecuting attorney and counsel for the defendant surrounding the defendant's use of marijuana as treatment for multiple sclerosis.

The prosecutor decided to proceed with the case, and Ms. Poling's trial was set on February 5, 1999. On January 21, 1999, the State filed a Motion *in Limine* seeking to prohibit any testimony or defense based on the medicinal qualities of marijuana upon multiple sclerosis.[1] On February 4, 1999, the defendant filed a response to the Motion *in Limine* by the State. The defendant argued that she should be able to put on her testimony, documentation, and treating physician's testimony regarding her use of marijuana in the treatment of her multiple sclerosis, under the criminal defenses of compulsion or medical necessity. The trial judge denied her that right.

Multiple sclerosis is a serious, progressive disease that will render Donna Poling paralyzed at some time, and will eventually kill her. She was diagnosed with multiple sclerosis in the late 1980's, and was at that time suffering tingling, pain, and an inability to urinate. From 1990–1995 she suffered temporary blindness, severe headaches, dizziness, additional tingling, pain, loss of muscle control, muscle weakness, loss of bladder function, and spasticity of her limbs.

During this time period she tried several prescription drugs (all those suggested by her treating physicians), including specifically Prednisone and Betaseron. These prescription drugs did not prevent the onset of the symptoms of her disease, nor did they lessen the symptoms. Additionally, the side effects of the medications were causing severe bruising, depression, and anger.

She attended counseling at the local community health center in an attempt to get treatment for the depression and anger. Ms. Poling's legal medications were costing up to $1,000 per month and were only partially

---

1. A motion *in limine* is a pre-trial request by a party in a case—civil or criminal—that the court not permit certain anticipated evidence to be admitted in the trial and not be seen or heard by the jury.

covered ($200 per month) under the health insurance policy that the family maintained through her husband's employment.

During this time Donna Poling continued to suffer two or more outbreaks of severe symptoms lasting 3 to 4 months in each year, which is typical of this disease. In August of 1995 Donna Poling read in a national publication entitled "Real Living with Multiple Sclerosis" that some people had been using marijuana to offset the symptoms of multiple sclerosis. She decided to try it. After beginning the use of marijuana as a treatment, she was symptom-free for almost 3 years.

She first began growing marijuana in the late fall or winter of 1997, to avoid purchasing the illegal drug. Her first plants were the plants seized by the Tucker County sheriff's department on March 30, 1998.

She smoked marijuana two to three times a week, in the evening, in her bathroom,

away from her children and husband. Her children were aware that she used marijuana as a treatment for her disease and were also aware that it is not something to be done for pleasure. After her arrest in March of 1998, Donna Poling suffered her first return of symptoms. She is very afraid that the debilitating symptoms of her disease will return for good.

So, in Ms. Poling's case, if the jury believed that she truly grew marijuana because she, a victim of multiple sclerosis, believed that she really needed it as a matter of medical necessity, to prevent blindness and paralysis, the jury could have found that she did not have a criminal state of mind—even though she performed the act of growing marijuana.[2]

The second reason that a defendant should be able to tell the jury why they did some-

2. For a full discussion of how the legal doctrine of "medical necessity" can take away the criminal state of mind, see the appendix to this dissent. I think that a Tucker County jury was entitled to hear from a medical doctor how Ms. Poling reasonably felt that she needed marijuana to prevent the serious symptoms of her disease. About a month after this case was argued before this Court, the following news was reported in *USA Today:*

> **Researchers Link Marijuana And The Suppression Of Multiple Sclerosis**
>
> London, England: Researchers at the University College of London have found a link between marijuana and the suppression of multiple sclerosis. The research, led by David Baker, studied mice suffering from chronic allergic encephalomyelitis, an animal autoimmune model for multiple sclerosis, and said a synthetic form of tetrahydrocannabinol (THC) ameliorated the mice's symptoms by reducing tremors and spasticity. The compounds injected into the mice stimulated Cannabinoid receptors on the surface of nerve cells. Testing on humans has not begun, but the results from this latest study are encouraging. "This lends credence to the anecdotal reports that some people with multiple sclerosis have said that cannabis can help control these distressing symptoms," said Lorna Layward, one of the study's authors and head of research at the Multiple Sclerosis Society of Great Britain and Northern Ireland.

And in another far-off land, Malaysia, we read how a court was helped to make a decision, with expert testimony on the medical use of marijuana by Dr. Lester Grinspoon, a Harvard Medical School professor:

> [Dr. Grinspoon's] first stop was the grim fortress like Pudu Prison, where he examined

the young man and found him, not surprisingly, terrified, depressed, and subject to muscle spasms in his arm and shoulder. Over the next several days, Grinspoon worked with the defendant's Malaysian Attorney, giving him an education in the medical-necessity defense. After Grinspoon had walked the man through the 3,000 year history of cannabis, recounting its widespread medical use from the beginning of the written word up through 1937, the lawyer was openmouthed. He immediately began making phone calls to influential Malaysian doctors and lawyers and arranged for them to hear the same lecture the next night. They, too, were amazed. Grinspoon told them that a ground breaking study of the medicinal uses of cannabis was based on observations made right there in Malaysia and India in 1839.

But when the legal team reached the courthouse the next morning, they were almost blown out of the water before Grinspoon could open his mouth. The lawyer introduced his American expert, and the judge exploded. "Why have you brought this man halfway around the globe to testify when it has been established that the defendant possessed 265.7 grams of cannabis and the punishment is prescribed?"

Reluctantly, since Grinspoon had already made the trip, the judge agreed to let him speak, even though it was obviously pointless. But as with the audience of the night before, the judge's skepticism melted, he became intrigued, and finally brushed the lawyer aside and began questioning the witness himself. Grinspoon told him the defendant was one of thousands of people who claim that marijuana is the best thing they can find for controlling the kind of painful spasms associated with

thing that may be a crime is simple fairness. It simply isn't *fair*, to a jury or to a defendant, for a person not to be able to explain *why* they did something—even something that may be a criminal act.

Juries are not machines—they are the conscience of the community. To make a conscientious decision, a jury needs to see a complete picture. For this reason, asbestos companies, if they want to, should be able to tell a jury why they covered up the fact that their product causes cancer. Even spouse-batterers should be able to tell a jury why they beat their spouses—and drunk drivers should be able to tell a jury why they got drunk and ran into someone.

People have the right to a fair and just day in court. If we don't let people at least explain *why* they did something, a courtroom can seem to be a grossly unfair and unjust place. And our court system must be ultimately about fairness and justice, or our citizens will simply lose faith in their courts.

I have little personal sympathy for drug use of any sort, except to treat real diseases. I am and have always been pretty close to a tee-totaller. Although I went to college in the 1960's, I never tried marijuana or other illegal drugs. In fact, I was a non-drinking president of my college fraternity. I've probably drunk less than a full bottle of wine in my life, and I have never even tasted beer or whiskey. I tried tobacco as a kid, but I have never been a smoker, chewer, or dipper.

But not everyone is as abstinent as I am. Sure, some of the most wicked people I have encountered have been people who used and abused tobacco, alcohol, marijuana and other drugs. But it is also true that many otherwise law-abiding, hardworking, and honest people use tobacco, alcohol, marijuana,[3] and other drugs.

Personally, I wish that they wouldn't—but I also personally question whether in all

---

quadriplegia, multiple sclerosis, and traumatic nerve injury.

After lunch, it was the prosecutor's turn. Grinspoon had been warned that the state was anxious to swing this young American from the yardarm and they did not look kindly on this intervention. In his opening volley, the prosecutor threatened to have Grinspoon himself arrested and thrown in prison for not following procedures, then waded into him with a withering barrage of questions. Unfortunately, the questions turned out to be based on misinformation, and each response from the professor steam-rolled the prosecutor with a roll call of references to the scientific literature. After an hour of this, the infuriated official said, "Dr. Grinspoon, all that you have reported here about the capacity of cannabis to relieve suffering of one type or another comes from papers and journals! What has been your experience in observing this for yourself?"

Wrong question. To a courtroom now packed with late arrivals who had heard of the furious duel, Grinspoon traced his experience back to that day in 1967 when his 10 year old son was diagnosed with acute lymphatic leukemia. At first, he said, Danny was good-natured about the treatments, but by 1971, he was involved in major chemotherapy and Grinspoon and his wife found themselves subjected to heart-wrenching scenes at the hospital. "He would start to vomit shortly after treatment and continue retching for up to eight hours. He vomited in the car as we drove home, and when we got there he had to lie in bed with his head over a bucket on the floor."

Then one day Grinspoon arrived at the hospital and found his wife and son already there.

They were uncommonly relaxed and it was obvious something was up. He was shocked to see his son take the medicine without a fight, and after it was over there was no sign of nausea. Instead of throwing up in the car, Danny asked if they could stop off for a submarine sandwich. When they got home, Grinspoon pulled his wife aside. She admitted she had stopped by the school yard on the way to the hospital and one of Danny's pals had given them a marijuana cigarette. She and Danny had smoked it together before the session.

Mike Gray, "Drug Crazy," Random House, New York, 1997, pp. 180–181, 185–187. Gray is a documentary film producer and author. "Drug Crazy" has been acclaimed by former U.S. Attorney General Elliott Richardson and former U.S. Surgeon General Dr. Jocelyn Elders.

3. It is not only "liberals" who are recognizing that the myths of marijuana are unfounded. Ronald Reagan protege Dick Chase Eldredge has written:

One of the major knocks on marijuana is that it causes otherwise productive, energetic people to become slothful and unmotivated. Evidence does not support that conclusion. Large numbers of successful, energetic people indulge with no external negative consequences other than the risk of legal sanctions.

Another common myth about marijuana is that it serves as a gateway to other drugs; that most cocaine users once smoked pot is offered as support for this position. Most heroin users once drank alcohol, but no one charges alcohol with being gateway to heroin. The reason for

cases their drug use should make them into criminals.

I recognize that *all* of the truly addictive/dangerous drugs that are in common use—like alcohol, tobacco, cocaine, barbiturates, amphetamines, and opiates—can and do cause large amounts of personal and family suffering and social harm.

However, experience teaches us that criminalizing the adult use of such drugs generally does nothing but make the situation worse. For example, we already tried prohibition with alcohol, and that "Noble Experiment" caused our grandparents and great-grandparents many of the same sorts of problems that our current "drug war" is causing for us.

Most experts agree that our society needs to move toward a treatment/medical/education model to deal with addictive/dangerous drug use—and to move away from the criminal justice model. I know that many people in law enforcement are very discouraged and troubled because society is asking them to fight a war that is not really winnable in the criminal justice system, and that is causing a huge drain on our social resources.[4]

The final decision whether or not to criminalize certain drug use is one to be made by our Legislature, of course. But it is this Court that has the right and the duty to decide what a defendant can tell a jury about *why* they committed an act that may be a crime. I think that Donna Jean Poling had that right.

I have included in an appendix to this dissent a discussion of the "medical necessi-

---

this inconsistency is that marijuana does not enjoy the social acceptance of alcohol and is therefore a politically convenient target for such allegations. It may be that marijuana users are more likely than the population at large to use cocaine—because the black-market supply networks for the two drugs overlap. There is nothing in the pharmacology of marijuana that would make a user more or less likely to indulge in another substance.

\* \* \* \* \* \*

In spite of hundreds of cases where patients have been helped by marijuana, the U.S. government persists in the position that more research is needed to determine the scientific efficacy of marijuana. However, no administration has yet been willing to fund and authorize the necessary research. Herein lies the irony: Government officials know the law prohibiting the medical use of marijuana is questionable, but are unwilling to risk the political heat of continuing research.

The impasse over the medical use of marijuana was finally broken by the initiative process in California and Arizona in 1996, as both states approved measures to legalize the sale of marijuana for medical purposes. As of 1997, six other states also had medical marijuana laws, and such laws were pending in five more, plus Washington, D.C. Conflicts between state and federal law complicate implementation. Dirk Chase Eldredge, "Ending the War on Drugs," Bridge Works Publishing Company, Bridgehampton, New York, 1998, pp. 24–25, 71–73, 90. Eldredge is a conservative Republican who co-chaired Ronald Reagan's gubernatorial campaign. He is a member of the Drug Policy Foundation, a think tank that promotes new thinking about drugs. His book has been praised by William F. Buckley, Jr. and Nobel Laureate Milton Friedman, among others.

---

4. For example, an amazingly high percentage (some say a third) of young African–American men are in the criminal justice system, as a direct result of the arguably failing "Drug War." To me, this situation is a national sin that God will be a long time in forgiving.

What happens when the police and the courts and the criminal justice system are commanded by politicians to treat a large amount of fairly harmless illegal drug use, and a smaller amount of more serious addiction, in the same fashion as robbery and murder? Some would say that we then see in the criminal justice system the growth of cynicism, lack of respect for proper procedures, blaming the victims, burn-out, loss of professionalism and civility, disregard of human rights, and other vices and abuses, including corruption. Moreover, many people argue that the zero-tolerance/lock-em-up approach of our current criminal-justice approach to drug policy itself creates other crimes. In fact, one could see the criminal-justice zero-tolerance approach to drugs as not just an ineffective medicine, but as a medicine that causes more of the very disease that the medicine is supposed to treat—social harm and damage. Seen this way, the side effects of our current drug policy include causing theft, mugging, and burglary—as desperate, hooked people seek money for costly illegal drugs. As illegal drug entrepreneurs protect their lucrative businesses, guns abound and people are killed. Communities live in fear. Police and community leaders and politicians are caught in a vicious cycle, trying to protect the community from the violence that is caused by the failed drug policy itself. In large part because of the current "War on Drugs," the police and the criminal justice system are seen in many poor and minority communities—by many fully law-abiding and hard-working people—as more a part of the problem, than as a part of the solution.

ty" legal defense in marijuana cases, that is taken from a website on marijuana law reform— http://www.norml.org/legal/med.defense.shtml. The discussion summarizes the legal position of those who contend that the medical necessity defense should be available in some marijuana criminal cases.

I do not necessarily agree with all of the statements in the discussion that I have placed in the appendix. But I do believe that under the correct view of the law, our Legislature's criminalization of marijuana cannot and does not entirely preclude a person like Ms. Long from using the "medical necessity" defense—especially where a doctor will testify that a person needs this drug.

For example, if the Legislature passed a law that said that aspirin has no medical benefits, and made possessing aspirin into a crime, I still don't think that our law could prohibit a person in pain from explaining to the jury that they needed aspirin to deal with their pain.

That is to say, I don't believe that the Legislature can repeal the laws of nature— and I don't think they intended to.

We are, as a society, slowly learning that there are no simple answers in creating more effective strategies to reduce social and personal harm from drugs. I believe that the young people who may read this dissent have the courage that it takes to face facts and build a better future. Because I believe in those young people, I do not despair—even though the majority's decision in this case is not what I think is right.[5] The majority

---

5. Our youth is our hope, and to saddle them with a legacy of despair based on "marijuana use" defies reality.

With America's Number One Problem Drug [marijuana] identified as the one teenagers are most likely to use, and every sneer, slammed door, and blast of Joan Jett pegged as evidence of a "drug problem," the War on Drugs became a powerful weapon for parents to use in their struggle with their teenagers. Blaming drugs for kids' troubles also worked within the family just as demonizing individuals' drug use worked in wider society: it obviated concern for "root causes" and let parents take their own behavior off the hook. If drugs were, as the Florida pediatrician Ian Macdonald liked to assert, a problem teenager's "only" problem, then parents needn't examine their own role.

&ast; &ast; &ast; &ast; &ast; &ast;

If anything is clear from the past 25 years of drug warfare, it is that marijuana—not crack, cocaine, or heroin—is politically the most important illegal drug. Precisely because it doesn't kill people who use it, spawn gun battles in city streets, enrich foreign drug lords, or inspire women to abandon their babies, marijuana separates drug policy for public welfare from drug policy for public relations. Without the marijuana ban, the country's "drug problem" would be tiny. There wouldn't be 11 million regular users of illegal drugs in the United States, there would be 2 million. Of those, about 350,000 use cocaine every day. Along with the country's half million heroin addicts, these hard-core users are our real "drug problem": tragic, resistant to solutions, but statistically minuscule.

Heroin and cocaine are the scary drugs that keep the Drug War's home fires burning, but vastly more people are touched personally by a war on marijuana that yields few benefits.

Lives aren't saved. Violent criminal organizations aren't disrupted. Instead, a lot of harmless potheads—and the generally peaceful growers who supply them—go to prison at enormous expense to the taxpayer. Diverting resources from that war to the treatment of our small but desperate population of drug dependents would be an act of medical logic and fiscal genius.

Dan Baum, "Smoke and Mirrors—The War on Drugs and the Politics of Failure," Little, Brown & Company, 1997, pp. 155, 264–265, 331–332. Baum is a former *Wall Street Journal* reporter.

Modern American drug and alcohol policy is a dry-drunk crusade. The shrill anger at teenagers emanating from Washington in the guise of "concern" is exactly the kind of denial and scapegoating to be expected from an older generation that has not confronted the dimensions of our own drug tragedies. Yet for all the sound and fury in the Beltway, the neighborhood reality is that adolescents seem to be forming their own drug policy. The large majority of teenagers, for now and for unknown reasons, are resisting both the addicted examples of many of their elders and the histrionics of the official anti-drug crusade.

Does marijuana kill? In the most recent year for which detailed national vital statistics are available, 1990, 8,381 drug overdose deaths are reported. Of these, three were attributed to all hallucinogens (marijuana, hashish, LSD, mescaline, psilocybin, peyote, etc.) put together. More dangerous by far were salicylates (44 deaths), aromatic analgesics (65 deaths), non-narcotic analgesics (aspirin, Tylenol, etc., 88 deaths), and nearly all other drugs. These are much topped in the death category, of course, by prescription drugs, heroin, cocaine, methamphetamine, and amphetamine. Diuretic drugs were implicated in 112 deaths,

decision could be seen as cruel and short-sighted.  I dissent.

## APPENDIX

Although an increasing number of states are enacting statutes permitting seriously ill people to use marijuana legally for medicinal purposes, the majority of states still provide no prospective access to marijuana for medical use.  In states where affirmative rights to use marijuana for medicinal purposes have not been enacted, individuals may still be prosecuted for possessing or using marijuana for treatment of their medical condition.  When these prosecutions occur, raising the medical necessity defense may provide a means of avoiding a criminal conviction.

The "medical necessity defense" is usually grounded in either a state's common law or general necessity defense statute.  Regardless of its origin, the basis of the necessity defense is that society is sometimes willing to excuse or even justify what would otherwise be illegal conduct that was done to avoid an even worse or greater evil. {1}  In doing so, the defense reflects society's understanding that sometimes forces beyond a person's control place the person in an emergency situation where he or she must choose between the harm or "evil" of breaking the criminal code or complying with the code and allowing an even greater harm or "evil" to occur.  In these situations, if a person violates the law in order to avoid the greater harm, the defense of necessity excuses the person from being guilty of what would otherwise be a crime.

"The pressure of natural physical forces sometimes confronts a person in an emergency with a choice of two evils: either he may violate the literal terms of the criminal law and thus produce a harmful result, or he may comply with those terms and thus produce a greater or equal or lesser amount of harm.  For reasons of social policy, if the harm which will result from compliance with the law is greater than that which will result from [violating] it, he is by virtue of the defense of necessity justified in violating it." {2}  The logic behind the defense is similar to the logic prohibiting the imposition of civil liability in situations where a person or property is harmed to avoid a greater harm. {3}  Stated differently, the defense applies where the individual actor determines that any reasonable person in his or her situation would find the personal consequences of violating the law less severe than the consequences of compliance. {4}  "While the act itself is voluntary in the sense that the actor consciously decides to do it, the decision is dictated by the absence of an acceptable alternative." {5}

"Traditionally, the defense of necessity has been characterized as being either a justification of or an excuse for criminal activity." {6}  While the differences between the two exist {7}, they share the common result of negating criminal liability.  Whether applied as a justification or excuse, the defense furthers the belief that people should not be punished for actions taken which were not of their own free will. {8}

"Penalizing one who acted rationally to avoid a greater harm will serve neither to rehabilitate the offender nor to deter others from acting similarly when presented with similar circumstances." {9}  Rather than discussed in terms of necessity, "[t]he matter is often expressed in terms of choice of evils: When the pressure of circumstances presents one with a choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser evil." {10}  For similar reasons, necessity defenses are sometimes labeled "competing harms." {11}  Under such circumstances, the evil brought about from

---

yet no drug officials called press conferences to warn about "fighting for your life" in ER over gout medicine.

\*     \*     \*     \*     \*     \*

But the low rate of teen marijuana smokers advancing to harder drugs is not the only flaw in Califano's "steppingstone" or "gateway" claim: There is scant evidence that use of one drug *causes* use of another drug.  Pot use, in and of itself, appears to predict no future prob-

lem with the hard stuff, as Clinton, Gore, and Clarence Thomas notably denote—though it appears directly related to a surfeit of middle-aged hypocrisy.

Mike A. Males, "The Scapegoat Generation," Common Courage Press, Monroe, Me., 1996, pp. 168–169, 182–183.  Mayles is a political scientist at the University of California, and served as the President of the Board of Directors of the Montana Children's Trust Fund.

violating the law is deemed to be less than the evil which would have resulted from literal compliance with the law.

For example, suppose Tom sees a little girl drowning in a backyard pool as he walks down his neighborhood sidewalk. Suppose further that Tom sees a sign between himself and the little girl which says, "No Trespassing Violators Will Be Prosecuted." Tom is now confronted with a choice. He can comply with the law and the little girl will drown, or he can break the law of trespass and avoid the greater evil of a little girl senselessly dying. If Tom were to be charged with trespass after choosing to save the little girl, he could raise the defense of necessity in order to avoid what would otherwise be a crime because the harm which Tom sought to avoid, the little girl's death, was greater than the harm resulting from violating the law against trespassing.

In the medical necessity context {12}, courts are required to balance the interest of an individual in his or her health and welfare against the government's interest in upholding the criminal law. {13} When the medicinal use of marijuana is in question, ". . . the court must balance the defendant's interest in preserving his health against the State's interest in regulating the drug involved." {14} In order to successfully present the defense in this context, the defendant will typically be required to convince the court that their health is threatened to the degree that engaging in otherwise criminal activity is warranted. Although the specific requirements vary from state to state {15}, this usually requires a person using marijuana for medicinal purposes to show that they acted under the reasonable belief that their marijuana use was necessary to avoid serious medical harm. {16} Medical testimony and evidence from a treating physician or medical expert is almost, if not always required to support the claim. {17} In at least one case, the absence of medical testimony prohibited the defense from being presented. {18}

The harm sought to be avoided must be more serious or greater than the harm or "evil" of breaking the applicable marijuana law. This aspect of the defense requires the judge or jury to evaluate the severity of the harm that would result without marijuana use as compared to the harm of violating the marijuana law. While it is difficult to anticipate what judges or juries will decide in a given case, the more severe the personal harm an individual is seeking to avoid, the greater the chance a judge or jury will decide the individual's efforts to avoid it where appropriate. Most importantly, the defense affords individuals the opportunity to present evidence of marijuana's ability to minimize the effects of their disease or illness. For example, in Washington v. Diana {19}, "[t]he defendant, a victim of multiple sclerosis, testified as to his belief that marijuana was a 'primary sedative' for the 'frustrations' caused by multiple sclerosis. While no argument was presented to the trial court concerning a medical necessity defense, the appellate court, in the 'interests of justice,' remanded the matter so that the issue could be fully determined. The court was cognizant that a necessity defense is generally available only when the physical forces of nature cause the accused to take unlawful action to avoid harm which social policy deems greater than that which results from a violation of the law. It determined nonetheless that the defendant should be afforded the opportunity to demonstrate the potential beneficial effects of marijuana on the symptoms of multiple sclerosis." {20}

Many jurisdictions also require that there be no other available options for the individual to avoid the harm. For example, in Idaho, the defense is not applicable where the compelling circumstances have been brought about by the accused or where a legal alternative is available to the accused. {21} In other words, if a viable, legal alternative treatment to marijuana exists, the individual cannot claim necessity as a defense. The reasoning behind this result is that because a legal means of avoiding the harm exists, violating the law is not necessary.

Technically, the defense is only applicable when there are no legal means of avoiding the harm. However one court accepted the viability of the medical necessity defense to marijuana possession in a glaucoma case where surgery, though risky, was nonethe-

less a possible alternative course of treatment. {22} Where the element is strictly required, it is likely to be contested. The prosecution and the individual frequently disagree about whether a legal alternative exits. Medical experts are used by both sides and the question is left for the judge or jury to decide. As one court reasoned, for medical conditions "[o]bjective standards of proof can be developed without undue hardship, since the existence of a disease and its response to the drug can be demonstrated scientifically." {23}

Although the current law of necessity in some states technically limits marijuana's medicinal use to situations where individuals have no other alternative, the law is usually applied in a more compassionate manner. NORML believes that marijuana laws should reflect the inherent rights of individuals to choose their own course of treatment as is reflected in other legal contexts. This reasoning was used by the court in applying the medical necessity defense to marijuana possession in United States v. Randall and further suggests that medical decisions be left to individuals entirely. For example, the abortion cases of Roe v. Wade {24} and Doe v. Bolton {25} stress the fundamental nature of an individual's right to preserve and control their own bodies. {26} These decisions allow a woman to terminate a pregnancy at any stage in which the mothers own existence is threatened. {27} The importance of these cases in the medical necessity context is their demonstration of just how "far-reaching is the right of an individual to preserve their health and bodily integrity." {28} According to the court in Randall, justification for using marijuana is even more easily arrived at because, unlike the situations in Doe and Roe, "... no direct harm will be visited upon innocent third parties; any major ill effects from the inhalation of marijuana smoke will occur to the defendant alone." {29} The Randall court went on to state that individuals growing marijuana for their own personal consumption do not contribute to the illegal trafficking of the drug and therefore are not injuring innocent members of the public. {30}

The Randall court also considered the reasoning of Stowe v. United States {31}, an unreported civil case. In Stowe, the plaintiffs sought to enjoin the FDA from preventing their cancer suffering spouses from receiving laetrile, a drug banned by the FDA because whether it was an effective cancer treating drug as unresolved. {32} The district court enjoined the defendants because "... the plaintiff's right to medical treatment with a substance which had demonstrably favorable effects on their cancers superseded any interest of the government in protecting the general public from a drug whose properties were not conclusively proven." {33} This right to medical treatment was the basis for the district court enjoining the FDA from preventing the plaintiffs from importing laetrile for their own use. {34}

\* \* \* \* \* \*

The requirement that no legal alternative be available may mean that the defense is no longer available in states where marijuana can be legally obtained for medical purposes. If marijuana is needed, the appropriate statute must be complied with in order to possess the substance. Individuals who illegally obtain marijuana will have considerable difficulty showing that illegal possession is necessary when a legal method is readily available. Another requirement for the defense is that the state legislature has not precluded the necessity defense's applicability to a given set of circumstances. As the number of medical marihuana cases increases, the possibility exists that a state legislature could amend their necessity defense statute to exclude the medical use or medical marijuana use defense. NORML intends to vigorously discourage any such attempt and to continue advocating the implementation of procedures for prospective access to marijuana for medicinal purposes.

Regrettably, a small number of state courts have ruled that the defense is not applicable in their state. Insufficient testimony regarding the medical need of the defendant and an unwillingness to meddle with the authority of the legislature were the most often articulated reasons for refusing to apply the defense.

For example, a Georgia court ruled there are no affirmative defenses to the possession or dissemination of marijuana for medical, health, or therapeutical purposes. {35} The court cited concerns that the benefits of marijuana treatment or therapy had not been medically or scientifically recognized and expressed concerns about infringing upon the role of the legislature. {36} According to the Court, the question of whether the use of marijuana for medical purposes constitutes a defense must be answered by the legislature. {37} "These are issues involving safety, health and community morals within the police power of the state posing questions for resolution by the General Assembly rather than by the courts. For us to rule otherwise would be a usurpation of a legislative prerogative." {38} While this result is disappointing, the fact that reliable scientific evidence continues to mount suggests that even in Georgia, if courts will not take action, perhaps the General Assembly will.

Even where the defense does apply, it is subject to change because medical research continues to find new medicinal uses for marijuana. As is true with any medication or course of treatment, whether marijuana is an appropriate means of treatment is a decision which should be thoughtfully made with the consultation of a physician.

\*       \*       \*       \*       \*       \*

Footnotes:

{1} See Wayne R. LaFave, Substantive Criminal Law S 5.4

{2} Id.

{3} Randall at 2249; citing C. Kenny, Outlines of Criminal Law 68–70 (1907).

{4} Randall at 2249, 2251.

{5} Id.

{6} Randall at 2251; See also the discussion of justification and excuse in Note, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum. L.Rev. 914 (1975).

{7} Where the defense is considered a justification, the criminal nature of the prohibited activity is negated. Randall at 2251. This conclusion is based upon the concept that criminality is derived from combining a prohibited act with an evil mind. Id. "Where the criminal act was compelled by outside circumstances rather than through the exercise of the actor's free will, the requisite criminal intent is considered to be lacking." Id. The absence of free will renders the crime incomplete because the actor did not have an evil mind while committing the act. Id. Because the requisite mental element is missing, the actor is relieved of criminal responsibility. Further, because anyone similarly situated would be equally without evil intent, the justification applies to all those so situated. Id. Necessity has also been applied in the form of an excuse. Id. "Under this view, criminal responsibility arises upon the performance of every willed action, regardless of the underlying reason for the choice. The actor may be excused from punishment for public policy reasons but not because he was without blame. Here, unlike jurisdictions applying the defense as a justification, all of the elements of the crime are present. But although guilt is established punishment is not required because of extenuating circumstances which mitigate the seriousness of the offense. Under this theory, the necessity defense must be applied on a case by case basis rather than by reason of a general rule." Id.

{8} Id.

{9} Id.

{10} Id.

{11} For example, see New Hampshire Criminal Code S 627:1; 17–A M.R.S.A. S 103.

{12} It is important to note that the necessity defense does not apply in non-medical drug possession cases. "The courts have consistently refused to acknowledge a non-medical necessity (or "choice of evils") defense in a state narcotics prosecution. Most often, the theory is rejected on the grounds that the defendant could have avoided the "emergency" at issue by taking advance precautions, or could have utilized a legal alternative to committing the subject crime. "Economic" necessity does not act as a defense to a state narcotics action, either, or

will "nonphysical" forces create a "choice of evils situation." 1 A.L.R.5th 938 (1992).

{13} See Randall at 2252.

{14} State v. Diana, 604 P.2d 1312, 1317 (Wash.App.Ct., 1979).

{15} For example, under New York Law the medical necessity defense requires the defendant to show: "1) the defendant acted under a reasonable belief, supported by medical evidence, that his or her action was necessary as an emergency measure to avert an imminent public or private injury; 2) the defendant's actions did not create the crisis; 3) it is clearly more desirable to avoid the public or private injury caused by violating the statute; 4) there are no available options; and 5) prior legislative action does not preclude the defense and defendant's actions are not based only upon considerations of the morality and advisability of the statute violated. People v. Bordowitz, 588 N.Y.S.2d 507, 511 (Criminal Court of the City of New York, New York County, Jury 5, 1991). Other jurisdictions require less in order to make a prima facie showing of the defense's applicability. Washington state allows a medical necessity defense where the court finds: "the defendant reasonably believed his use of marijuana was necessary to minimize the effects of [a medical condition]; 2) the benefits derived from its use are greater than the harm sought to be prevented by the controlled substances law; and 3) no drug is as effective in minimizing the effects of the disease. State v. Diana, 604 P.2d 1312, 1317 (Ct.App.Wash.1979). Washington also requires medical testimony to corroborate the defendant's assertion that he or she reasonably believed their actions were necessary to protect their health. State v. Diana, 604 P.2d 1312, 1317 (Court of Appeals of Washington 1979). It is worth mentioning that while articulating these general requirements, the court also emphasized that the defense "... exists only under very limited circumstances not present in the routine case involving controlled substances." State v. Diana, 604 P.2d 1312, 1317 (Court of Appeals of Washington 1979). A similar approach was taken in State v. Hastings, 801 P.2d 563 (Idaho 1990) where the court allowed a defendant charged with felony possession of marijuana was entitled to assert a defense of necessity under Idaho Code 733–116. "The defendant argued that the marijuana plants found growing in her basement during a police search were medically necessary to control pain caused by her rheumatoid arthritic condition. While the court refused to create a special defense of 'medical necessity,' it ruled that the defendant, upon remand to the trial court, was entitled to introduce evidence related to the common law defense of necessity. 1 A.L.R.5th 938 (1992), State v. Hastings, 801 P.2d 563 (Idaho 1990). The elements of the defense were: (1) a specific threat of immediate harm; (2) that the same objective could not have been accomplished by less offensive alternatives; and (3) that the harm caused was not disproportionate to the harm avoided. State v. Hastings, 801 P.2d 563 (Idaho 1990).

While unwilling to create a special medical necessity defense, other courts hold that the medical use of marijuana is covered under the common law necessity defense. See State v. Hastings, 801 P.2d 563, 364 (Idaho 1990). The elements of the common law defense are: 1) A specific threat of immediate harm; 2) The circumstances which necessitate the illegal act must not have been brought about by the defendant; 3) The same objective could not have been accomplished by a less offensive alternative available to the actor; 4) The harm caused was not disproportionate to the harm avoided. State v. Hastings, 801 P.2d 563, 364 (Idaho 1990); see also E. Arnolds & N. Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim.Law & Criminology 289, 294 (1974); C. Kenny, Outlines of Criminal Law, 68–70 (1907); United States v. Moore, 486 F.2d 1139 (D.C.Cir.1978). Perhaps the broadest application of the defense occurred in People v. Bordowitz, 588 N.Y.S.2d 507 (1991 City Crim Ct). "Defendants in prosecution for criminal possession of hypodermic instrument were not guilty where their defense that they were engaged in needle exchange program justified by exigencies created by AIDS epidemic fell within medical necessity defense. Defendants did not create AIDS crisis; harm defendants sought to avoid—

spread of AIDS virus—was greater than harm of violating the statute; there were no meaningful available options since there were insufficient drug treatment programs in city and no reason to believe that more treatment slots would come into existence in the near future; no legislative or executive action precluded necessity defense in this case; and medical evidence indicated that use of clean needle by addicts prevents the spread of HIV infection. 1 A.L.R.5th 938 (1992), People v. Bordowitz, 588 N.Y.S.2d 507 (1991 City Crim Ct).

In more general terms, Section 3.02 of the Model Penal Code provides: Justification Generally: Choice of Evils.

1) Conduct to which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:

a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and

b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity of his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

{16} Although the underlying rationale for the rule is largely uniform, the actual elements of the defense vary among jurisdictions. Consequently, practitioners are strongly advised to consult the case law of the particular jurisdiction in preparing to present the defense.

{17} For example, Washington requires medical testimony to corroborate the defendant's assertion that he or she reasonably believed their actions were necessary to protect their health. Washington v. Diana, 604 P.2d 1312, 1317 (Wash.App.Ct.1979)

{18} See State v. Bachman, 595 P.2d 287 (Hawaii, 1979). "While the court considered it 'entirely possible' that medical necessity could be asserted as a defense to a marijuana possession charge in a 'proper case' (pursuant to HRS 703–302), such a defense would require proof of the beneficial effects of marijuana use on the defendant's condition by competent medical testimony, as well as the absence or ineffectiveness of more conventional medical alternatives. The court emphasized that relief from 'simple discomfort' would not suffice. Instead, the court said, the harm to which defendant is exposed must be 'serious' and 'imminent.' The court noted, as well, that a statutory vehicle existed in the jurisdiction whereby marijuana was available through prescription by a licensed medical practitioner." 1 A.L.R.5th 938 (1992).

{19} 604 P.2d 1312, 1317 (App.Ct.1979).

{20} 1 A.L.R.5th 938 (1992).

{21} State v. Diana, 604 P.2d 1312, 1316 (Court of Appeals of Washington 1979); citing W. LaFave & A. Scott, Handbook on Criminal Law, 381–83, 386 (1972).

{22} See United States v. Randall, 104 Washington Daily Law Reporter Num. 250; 2249 (D.C.Sup.Ct.1976).

{23} United States v. Randall, 104 Wash. Law Rep. (Number 250) 2249, 2254 (December 28, 1976).

{24} 410 U.S. 113 (1973).

{25} 410 U.S. 179 (1973).

{26} See Randall at 2253.

{27} Id.

{28} Id.

{29} Id.

{30} Id.

{31} Civil No. 75–0218–B (W.D.Okla., 1975).

{32} Randall at 2253.

{33} Id.

{34} Id.; See also Keene v. United States, Civil No. 76–0249–H (S.D.W.Va., 1976).

318

{35} Spillers v. State, 245 S.E.2d 54, 55 (Ga. App.1978); See also State v. Tate, 505 A.2d 941 (N.J.1986); State v. Pillard, 293 S.E.2d 278 (N.C.1982), app.dismd 294 S.E.2d 374 (N.C.1982); 1 A.L.R.5th 928 (1992).

{36} Id.

{37} Id.

{38} Id.