STATE OF WEST VIRGINIA

*v.*

SUSAN GRINSTEAD

(No. 13110)

Decided July 16, 1974.

1002

*Albright & Richmond, Joseph P. Albright* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *Richard E. Hardison,* Deputy Attorney General, *E. Leslie Hoffman, III,* Assistant Attorney General for defendant in error.

HADEN, JUSTICE:

Susan Grinstead was convicted by a jury in the Circuit Court of Wood County for the possession, delivery and sale of a drug called lysergic acid diethylamide, commonly known as LSD. The appellant was indicted pursuant to

the colorable authority of the Dangerous Drugs Act, West Virginia Code, chapter 16, article 8B, section 1, *et seq.,* as amended. This Act and other prior drug control laws have since been repealed and wholly supplanted by the adoption of the Uniform Controlled Substances Act, effective July 1, 1971. *Code* 1931, 60A-1-101, *et seq.,* as amended.

She appeals the conviction and an indeterminate sentence of one to five years in prison imposed by the court because she believes that the possession, delivery, or sale of LSD were not crimes under the Dangerous Drugs Act and that a regulation of the West Virginia Board of Pharmacy purporting to declare the possession, delivery or sale of this drug to be felonies under the Act was an invalid action accomplished in excess of the lawful powers of the Board of Pharmacy as delegated to it by the Legislature. Alternatively, she asserts that if the Board of Pharmacy acted within the scope of powers delegated to it by the Legislature, that the pertinent section of the Act itself is unconstitutional as an ineffectual attempt at delegation of a purely legislative power to another branch of the State government or to the federal government for "completion" of a criminal law. Further, that if the Act in question should be sustainable as a proper delegation of legislative power, then by the terms employed in it purporting to define the objects of criminal proscription, it is unconstitutional on its face because the terms used in the Act, specifically "dangerous drugs," unaccompanied by qualifying legislative standards, definitions or safeguards, are unintelligibly vague and indefinite. As such, the employment of vague terms did not inform the accused of the crimes for which she was charged and convicted and also, deprived her of due process of law within the meaning of the United States and West Virginia Constitutions.

The defendant raised these questions of constitutionality by motions to quash made in advance of trial and preserved them by appropriate motions made throughout trial.

The facts adduced at the trial are irrelevant to the questions presented upon this appeal. Rather, our attention is directed to the statute in question, the actions of the Board of Pharmacy taken under colorable authority of the statute, the language of the indictment, and the substantive crimes charged to the defendant.

As previously noted, the appellant was indicted pursuant to alleged violations of the Dangerous Drugs Act, West Virginia Code, chapter 16, article 8B, section 1, *et seq.,* as amended. *Section* 1, in effect at the time of appellant's indictment in 1970 provided, in part, as follows:

" (1) The term 'dangerous drug or drugs' means (a) the salts and derivatives of barbituric acid or compounds, preparations or mixtures thereof; (b) any derivative of barbituric acid which has been designated by the State board of pharmacy as being habit forming; (c) any drug which contains any quantity of amphetamine or any salt of amphetamine or any salt of an optical isomer of amphetamine or any substance which the State board of pharmacy, after investigation, has found to be, and by regulation designated as habit forming because of its stimulant effect on the central nervous system; and (d) any drug which, under the regulations promulgated in accordance with the Federal Food, Drug and Cosmetic Act of June, twenty-five, one thousand nine hundred thirty-eight, or any amendment thereto, is designated as dangerous or habit forming: Provided, that the term 'dangerous drug' shall not include any drug the manufacture or delivery of which is regulated by the narcotic laws of the United States or of this State . . . ."

*Section* 6 (*Code* 1931, 16-8B-6, as amended) makes it a crime for any person not otherwise exempt under the article to possess, deliver or sell a dangerous drug defined in *Section* 1, *supra.* Upon conviction of an accused, it provides that a first offender shall be punished with a fine not exceeding one thousand dollars or be subject to an indeterminate term of one to five years in prison, or both.

Legislative history in regard to criminal sanctions respecting traffic in drugs is important to the disposition

of this case because every drug law enacted prior to 1971 supplemented a previous less inclusive measure on the same subject. In the context of construing other criminal statutes regulating homogenous activities, we recently held:

> " 'Statutes relating to the same subject, regardless of the time of their enactment and whether the later statute refers to the former statute, are to be read and construed together and considered as a single statute the parts of which had been enacted at the same time.' Point 1 Syllabus, *Delardas v. Morgantown Water Commission,* 148 W.Va. 776." Syllabus point 5, *State v. Flinn, Barker, and Gentry,* . W.Va. ...., 208 S.E.2d 538 (Case Nos. CC888, CC889, and CC890: decided July 2, 1974).

The Dangerous Drugs Act, *supra,* was enacted by the Legislature in the year 1965. It was the final piecemeal supplement to earlier criminal and regulatory laws controlling traffic in certain drugs. Beginning in 1891 and continuing with amendments to the law through 1923, this State, by legislative enactment had made it a crime to sell or give away, without prescription, certain commonly known and prescribed drugs such as cocaine, alpha or beta eucaine, opium, morphine, heroin, chloral hydrate, and derivative preparations containing these drugs. *Code* 1931, 16-8-6 and 7 [Poisons and Narcotics (Act)]. The breadth of that Act was augmented by the enactment of the Uniform Narcotic Drug Act in 1935 which, with later amendments, generally prohibited possession, sale or delivery of certain narcotic drugs comprising or derived from cocoa leaves (cocaine or its derivatives), opium, isonipecaine, and cannabis (commonly known as marijuana or "pot"). *Code* 1931, 16-8A-1, *et seq.,* as amended.

The additional necessity for the enactment of the Dangerous Drugs Act, *supra,* was occasioned in 1965 by the increased traffic and abuse in barbituates, amphetamines and other un-named drug substances "which the State board of pharmacy, after investigation, has found to be, and by regulation designated as habit forming because of

its stimulant effect on the central nervous system; . . . ." *Code,* 1931, 16-8B-1 (a), (b) and (c), as amended. There also, in a "catch-all" category the Legislature further expansively defined dangerous drugs to include " (d) any drug which, under the regulations promulgated in accordance with the Federal Food, Drug and Cosmetic Act of June, twenty-five, one thousand nine hundred thirty-eight, or any amendment thereto, is designated as dangerous or habit forming: . . . ." *Id., Code* 1931, 16-8B-1 (d), as amended.

From the foregoing review, it is apparent that as of the date defendant Susan Grinstead was indicted, the West Virginia Legislature had not seen fit to explicitly proscribe, prohibit or regulate the possession, sale or delivery of the drug called lysergic acid diethylamide and more commonly known as LSD. Moreover, none of the aforementioned Acts purported to regulate or prohibit possession, delivery or sale of those drugs which could be generally classified as hallucinogens. As will appear, the federal government also had taken no action in respect to the control of this particular hallucinogen prior to the enactment of the West Virginia Dangerous Drugs Act.

Midway in the decade of the "Sixties" however, it became common medical and social knowledge that a new and terrifying drug known as LSD was being used, sold, and delivered indiscriminately. Medical findings, personal interviews with users, and graphic accounts by eye witnesses horrifyingly illustrated the dangerous, permanent, and sometime fatal effects of this drug upon the human mind and body.

To control the menace posed by the traffic in, and abuse of, this new hallucinogenic substance, the United States Congress, in January 1968, amended Title 21, U.S.C. § 321 (v) [§ 201 (v) of the Food, Drug and Cosmetic Act, *supra*] to include therein the listing of lysergic acid diethylamide as being a drug having a potential for abuse and coming under the classification of a dangerous drug because of its hallucinogenic effect.

In February 1968, the Code of Federal Regulations, Part 166, Title 21, adopted this change in the federal act, and made the classification as the Federal Food, Drug and Cosmetic Act directed:

"§ 166.3 Listing of drugs defined in Section 201 (v) of the act.

• • • •

"(c) The Commissioner has investigated and designated all drugs, unless exempted by regulations in this part, containing and amount of the following substances as having a potential for abuse because of their:

• • • •

"(3) Hallucinogenic effect:

"Established name   Some trade and other names

• • • •      • • • •

"LSD-25; LSD   d-Lysergic acid diethylamide."

Then, with explicit reference to the action taken by the federal government, the State Board of Pharmacy, acting under the authority of the "catch-all" clause of the statute, *Code* 1931, 16-8B-1 (d), as amended, declared that several drug substances listed on the federal schedule and, specifically LSD and LSD-25, both otherwise known as lysergic acid diethylamide to be dangerous or habit forming drugs "which have a potential for abuse because of their depressant or stimulant effect on the central nervous system or their hallucinogenic effect." Article 17, *Rules and Regs., West Virginia Board of Pharmacy* (filed March 11, 1968). Thus, by promulgation and without the blessing of legislative amendment to the State Dangerous Drugs Act, the Board of Pharmacy found and declared that the possession, delivery or sale of LSD by one not otherwise exempt under State law to be a crime within the meaning of the Act and specifically Section 1 (d), *supra,* thereof. It was through this chain of governmental action, her own conduct, and by indictment that Susan Grinstead was charged with the crimes for which she was convicted.

As stated in the indictment the appellant was charged with possession, delivery and sale of LSD:

". . . [A] drug which contained a substance which the State Board of Pharmacy, after investigation,

had found to be and by regulation filed in the Office of the Secretary of State of the State of West Virginia on March 11, 1968, designated as habit forming because of its stimulant effect on the central nervous system; . . ."

Although the language of the indictment would indicate prosecution under Subsection (1) (c) of *Code*, 1931, 16-8B-1, as amended, it is clear from the record that the Board of Pharmacy declared conduct in respect of LSD unlawful under authority of Subsection (1) (d), *supra*.

The precise legal problem presented in this case was recently considered by this Court. In the case of *State ex rel. Scott v. Conaty*, 155 W.Va. 718, 187 S.E.2d 119 (1972), we passed upon the administrative action of the State Board of Pharmacy taken in March of 1968 designating LSD, LSD-25, and other drugs as dangerous and proscribed drugs the possession, delivery and sale of which in the hands of an unauthorized person would make that person liable for conviction of the crimes specified in *Code* 1931, 16-8B-1, *et seq.*, as amended. In that opinion, we held that the administrative action taken by the Board of Pharmacy was lawful and proper as being within the limits of authorization delegated to the board by the Legislature in the enactment of *Article* 8B, *supra*. We also held that the statute in question was constitutional. In that case as in this one, the principal thrust of the appellant's challenge to the statute was that it was an invalid delegation of legislative power to an executive board because the statute contained no standards and that it did not define the crimes or objects of criminal activity proscribed with sufficient certainty. This aspect of the constitutional challenge was couched in terms attacking the statute as being "void for vagueness" and, as such, depriving one charged with a crime thereunder of due process of law in violation of the West Virginia and Federal Constitutions. The appellant also makes a related challenge to the face of the indictment. She says that a charge of a crime in the vague language of the questioned statute does not apprise the chargee with notice of

prohibited conduct, in direct violation of West Virginia Constitution, Article III, Section 14. See *State ex rel. Hubbard v. Spillers,* 157 W.Va. 522, 202 S.E.2d 180 (1974) for application of the principle.

In the very recent case of *State v. Flinn, Barker, and Gentry, supra,* Justice Sprouse, speaking for a unanimous Court, exhaustively treated the circumstances under which this Court would hold a criminal statute void by reason of vagueness. That case reiterated, among other things, that:

> " 'When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment.' Point 3 Syllabus, *Willis v. O'Brien,* 151 W.Va. 628." Syllabus point 4, *Id.*

This is, of course, the guiding rule of construction for an appellate court in reviewing the correctness of legislative policy. There, we reaffirmed the constitutional validity of the statutes making it a crime for an adult to contribute to the delinquency of a minor, but also struck down two subsections of that statute which were too vague in definition of proscribed criminal conduct to meet the test of due process. In sustaining the major portions of the statute, we held:

> "A criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication." Syllabus point 1, *id.*

We also elaborated as follows:

> "Criminal statutes, which do not impinge upon First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certainty and definiteness by construing the statute in light of the conduct to which it is applied." Syllabus point 3, *id.*

Applying those principles to the case at hand, we have no problem in rejecting an attack upon the statute because it

is sufficiently certain in its terminology to accord one charged with crimes specified thereunder with both due process and notice of the crime of which he is charged. In these respects we believe the holding of the *Scott* case to be correct and unassailable.

On the other hand, while a statute may be sufficiently definite in specifying criminal acts so as to provide notice of proscribed conduct, it may be invalid as incomplete if it is left to a body other than the Legislature to determine without benefit of legislative standards what shall and shall not be an infringement of the law. Tested in this manner, a statute, purporting to make a delegation to a body with expertise in a particular area, may be unconstitutional. 16 AM. JUR. 2d *Constitutional Law* § 257 (1964).

Nevertheless, constitutional powers of the Legislature are particularly broad in matters of health:

> "This Court has passed upon and recognized the right of the Legislature to delegate its police powers to regulate certain matters to boards and commissions under standards proscribed in the statute or inherent in the subject matter, and wider latitude is given to such delegation of power where public health, morals, safety and welfare are involved. This is particularly true where, as in the case of drugs, the expertise of a board or commission is required in a specific scientific field." *State ex rel. Scott v. Conaty, supra,* at 122 of the South Eastern Second Reporter.

Accordingly, we apprehend no disability in the Dangerous Drugs Act as it delegates to the Board of Pharmacy the right to expand the list of proscribed drugs by adding thereto substances developed and derived from barbituric acid, amphetamines or any other substance which the Board of Pharmacy after investigation has found and declared to be "habit forming because of its stimulant effect on the central nervous system; . . . ." See *Code,* 1931, 16-8B-1 (1) (a), (b), and (c), as amended. We reaffirm without elaboration that those three subsections

contain adequate standards and limitations to protect the delegation of legislative prerogatives.

However, in subsection (d), the Legislature also said that the term dangerous drug or drugs means "any drug which, under the regulations promulgated in accordance with the Federal Food, Drug and Cosmetic Act of June, twenty-five, one thousand nine hundred thirty-eight, *or any amendment thereto, is* designated as dangerous or habit forming: ...." (Emphasis supplied.) As recognized by the Court in the *Scott* case, *supra,* at page 122: "[S]tatutes adopting laws or regulations of the federal government effective at the time of enactment of the statute adopting the same, are valid." As that general rule correctly expresses, it is permissible for the West Virginia Legislature or any legislative body to adopt by incorporation and reference conduct which previously has been declared to be unlawful by the United States Congress, so-called model or uniform legislation, or general enactments of other legislative bodies. There is no inhibition, constitutional or otherwise, to this "incorporation by reference" principle as it applies to law in existence at the time of the adoption of the "incorporating" legislation, so long as the delegate agency follows the directions of its creator and due process requirements are given recognition in the promulgation of effectuating regulations.

On the other hand, when a legislative body delegates its legislative powers so loosely as to permit another legislative body or an executive board or agency to redefine and expand the criminal acts *in futuro* and without limitation, such attempt at delegation is constitutionally invalid. In the *Scott* case, *supra,* this Court cited the case of *State v. Johnson,* 84 S.D. 556, 173 N.W.2d 894 (1970), but we failed to apply its holding to Subsection 1 (d) of *Code* 1931, 16-8B-1, as amended. The rule recognized and applied in the *Johnson* decision explains the extent to which the execution of legislative fiat may be delegated to another body, but, as well, contains a significant limitation. In striking down a very similar provision of the South Dakota Drug Abuse Control Act, that court ruled

that although statutes adopting laws or regulations of other states, the federal government, or any of its agencies, effective at the time of adoption, are valid, attempted adoption of future laws, rules or regulations of other states, or of the federal government, or of its agencies, is unconstitutional as an unlawful delegation of the legislative power. See page 895 of the North Western Second Reporter, *supra.*

Considering that it was not unlawful to possess, deliver or sell LSD under federal law until January 1968 and considering also that the West Virginia Legislature previously had not declared hallucinogenic drugs generally, or LSD specifically, to be controlled drugs, it appears from the language of the regulation adopted by the Board of Pharmacy in March 1968 that the indictment in this case emanated from the 1968 amendment of the federal law. Implicitly, the Board's action was not supported by authority of West Virginia legislation passed in 1965 and silent on regulation of this chemical substance. This point has been brought forcefully to our attention now and we cannot overlook it even in the face of our own recent *Contra* decision in the *Scott v. Conaty* case, *supra.*

Only the Legislature can enact *malum prohibitum* laws. West Virginia Constitution, Article VI, Section 1, reposes the legislative power in the legislative department and only it can declare criminal, acts of persons which would be otherwise lawful. The Legislature cannot delegate its authority to enact criminal laws to an agency which is a unit of the executive branch of State government, nor can it, under the guise of a colorable delegation, permit the Board of Pharmacy to adopt a federal law which has not been given prior approval by the Legislature. Unfortunately, the *Scott* case must be overruled on this point, and it is our further opinion that *Code* 1931, 16-8B-1 (1) (d), as amended, is unconstitutional on its face in that it purports to delegate to the Board of Pharmacy the power to declare unlawful drugs which may be designated as dangerous or habit forming by the federal government prospectively, *in futuro,* and without limitations. *State v.*

*Johnson, supra;* See also, *Cheney v. St. Louis S. W. Ry. Co.,* 239 Ark. 870, 394 S.W.2d 731 (1965); *Dawson v. Hamilton,* 314 S.W.2d 532 (Ky. 1958); *Seale v. McKennon,* 215 Or. 562, 336 P.2d 340 (1959); *Nostrand v. Balmer,* 53 Wash.2d 460, 335 P.2d 10 (1959).

Under the West Virginia Constitution, Article VI, Section 1, and Article V, Section 1—the latter insuring separation of powers among the legislative, the executive and judicial branches of government—enactment of criminal statutes is solely a legislative function. See *State ex rel. Davis v. Oakley,* 156 W.Va. 154, 191 S.E.2d 610 (1972); *State ex rel. Myers v. Wood,* 154 W.Va. 431, 175 S.E.2d 637 (1970); *State v. Lantz,* 90 W.Va. 738, 111 S.E. 766 (1922). The authority to enact laws, being exclusively a legislative function, cannot be transferred or abdicated to others. *State v. Harrison,* 130 W.Va. 246, 43 S.E.2d 214 (1947). The constitutional prerequisite to a valid statute is that the law shall be complete when enacted. *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969).

As the section of the statute under which the appellant Susan Grinstead was indicted is void, so too, the indictment founded thereon is void. For these reasons, the judgment of the Circuit Court of Wood County is reversed and the case is remanded with directions that the indictment charging Susan Grinstead with crimes be quashed.

*Reversed and remanded with directions.*