591 S.E.2d 744

**FOUNDATION FOR INDEPENDENT LIVING, INC., A West Virginia Non-Profit Organization; Mohawk Tribe # 11, Inc., A West Virginia Non-Profit Organization; Philip Dingess and Wanda Dingess, DBA Adam's Avenue Floral; Blevin's Entertainment, Inc., DBA Blevin's Roofing Company, and Other Similarly Situated Individuals and Businesses, Plaintiffs Below, Appellees,**

v.

**The CABELL–HUNTINGTON BOARD OF HEALTH, Defendant Below, Appellant,**

and

**State of West Virginia ex rel. Kanawha–Charleston Board of Health, Petitioner,**

v.

**The Honorable Charles E. King, Judge of the Circuit Court of Kanawha County, West Virginia, and David Dryden, Respondents.**

**Nos. 31120, 31616.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 2003.

Decided Dec. 2, 2003.

Robert R. Fredeking, II, Paul E. Biser, Fredeking & Fredeking Law Offices, Huntington, for the Appellees Foundation for Independent Living, et al.

W. Edward ReBrook, III, Hunt & Serreno, Charleston, for the Respondent, David Dryden.

Raymond A. Nolan, Assistant Prosecuting Attorney, Cabell County, Huntington, for the Appellant The Cabell–Huntington Board of Health.

Victor Flanagan, Erik T. Engle, Pullin, Fowler & Flanagan, Charleston, for the Petitioner, Kanawha–Charleston Board of Health.

John R. Hoblitzell, Kay, Casto & Chaney, PLLC, Charleston, Debra Scudiere, Teresa J. Dumire, Kay Casto & Chaney, PLLC,

Morgantown, for Amici Curiae, Local Health Association of West Virginia, et al.

ALBRIGHT, Justice.

This case began as an appeal from a declaratory judgment action involving a clean indoor air regulation adopted by the appellant, Cabell–Huntington Board of Health (hereinafter individually referred to as the "C–H Board"). The C–H Board seeks through this appeal to establish its authority to implement the regulation by requesting reversal of the February 18, 2002, order of the Circuit Court of Cabell County declaring the regulation an impermissible use of police power and granting permanent injunctive relief. The appellees in the Cabell–Huntington appeal are the Foundation for Independent Living, Inc., Mohawk Tribe # 11, Inc., Philip Dingess and Wanda Dingess d/b/a Adam's Avenue Floral, and Blevins Entertainment, Inc. d/b/a Blevins Roofing Co. and other similarly situated businesses (hereinafter referred to as "appellees"). While supporting the validity of injunctive relief in this matter, the appellees also raise a cross assignment of error claiming that the C–H Board violated the Open Governmental Proceedings Act in the process of adopting the regulation.

During the pendency of the Cabell–Huntington appeal, the Kanawha–Charleston Board of Health (hereinafter individually referred to as the "K–C Board") adopted a similar clean indoor air regulation. Mr. David Dryden challenged the implementation of the regulation in the Circuit Court of Kanawha County, which resulted in an order dated July 24, 2003, granting a preliminary injunction enjoining the K–C Board from enforcing its clean indoor air regulation in establishments possessing "private club" liquor licenses. The K–C Board sought to dissolve the preliminary injunction by petitioning for a writ of prohibition with this Court. Given the comparable issues raised, the right to intervene was granted to the parties in the Kanawha–Charleston case. Subsequently, the parties in the Kanawha–Charleston case were granted full party status and the cases were consolidated for purposes of this decision.

■ In addition to the record, briefs of the parties, and oral arguments presented, the Court has also considered the joint brief of the amici curiae: Local Health Association of West Virginia; West Virginia Public Health Association, Inc.; West Virginia Association of Sanitarians; West Virginia State Medical Association; West Virginia Hospital Association; Coalition for a Tobacco–Free West Virginia; Harrison County Medical Society Alliance; American Lung Association of West Virginia; National Association of Local Boards of Health; and Americans for Nonsmokers' Rights.[1] As a result of our study of the issues and relevant law, we conclude that local boards of health have the authority to develop and implement regulations to restrict smoking in enclosed public places.

## I. Facts and Procedural Background

The C–H Board and the K–C Board (hereinafter collectively referred to as "Boards") are local boards of health respectively servicing Cabell County, including the City of Huntington, and Kanawha County, including the City of Charleston. For the sake of clarity, the development of the cases of the Boards are related separately.

## A. C–H Board Facts

In fulfilling one of its statutory responsibilities of promoting and maintaining clean air and water,[2] the C–H Board adopted an order in 1995 setting forth a clean indoor air regulation for its service area. That regulation was amended and superseded by the adoption on December 12, 2001, of the "Cabell County Clean Indoor Regulation of 2001," which prohibited smoking in all enclosed public areas within Cabell County.[3] Soon after

---

1. We pause here to extend our sincere appreciation to the amici curiae for their involvement, including a wealth of exhibits accompanying their joint brief, which aided our deliberations in this matter.

2. See W.Va.Code § 16–2–11(a)(1)(ii) (2000) (Repl.Vol.2001).

3. The joint brief of the amici curiae represents that local boards of health covering forty-six of the state's fifty-five counties have adopted clean

the adoption of the later regulation, the appellees instituted a declaratory judgment action in the circuit court to challenge the subject regulation and obtain preliminary and permanent injunctive relief. Following a hearing on January 10, 2002, the lower court issued a preliminary injunction and set a hearing for February 14, 2002, to address the motion for permanent injunctive relief. On February 18, 2002, the lower court granted a permanent injunction invalidating the Clean Indoor Air Regulation of 2001, chiefly on the basis that the C–H Board overstepped its authority by stating in the regulation that any violation of its provisions would constitute a misdemeanor under West Virginia Code § 16–2–15 (2000) (Repl.Vol.2001). In response to the February 18, 2002, order, the C–H Board filed a Motion to Reconsider and Amend Declaratory Judgment Order or, Alternatively, to Clarify the Court's Order. This motion was denied by order entered on June 18, 2002. The C–H Board's petition for appeal was granted by this Court on February 13, 2003.

## B. K–C Board Facts

The K–C Board approved similar clean indoor air regulations on April 3, 2003, to take effect on July 2, 2003. A challenge of the regulations was initiated in the Circuit Court of Kanawha County by Mr. Dryden on July 17, 2003, by filing a petition for writ of mandamus and request for injunctive relief. The lower court granted a preliminary injunction by order dated July 24, 2003, enjoining the K–C Board from enforcing its regulations in establishments possessing liquor licenses. The lower court reasoned that any establishment maintaining a liquor license was by definition in the Alcohol Beverage Control Act, West Virginia Code Chapter 60, a private club and outside the regulatory control of the local health department. The K–C Board filed a petition for writ of prohibition with this Court on July 29, 2003.[4] Given the similarity of issues with the Cabell–Huntington case, the parties to

the action in the Circuit Court of Kanawha County were granted intervenor status by this Court on August 18, 2003. Thereafter, this Court by order entered November 19, 2003, deemed the briefs and arguments of the intervenors as a response to a rule to show cause why a writ a prohibition should not issue, resulting in the consolidation of the Cabell–Huntington and Kanawha–Charleston cases for purposes of decision.

## II. Standard of Review

The C–H Board's appeal from the "circuit court's entry of a declaratory judgment is reviewed *de novo.*" Syl. Pt. 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995). This level of review is warranted "because the purpose of a declaratory judgment action is to resolve legal questions." *Id.* at 612, 466 S.E.2d at 463. To the extent that our review of the declaratory judgment proceeding involves "any determinations of fact made by the circuit court in reaching its ultimate resolution ... [we employ] a clearly erroneous standard." *Id.*

In the K–C Board case, we are called upon to determine whether a petition for writ of prohibition should be granted. This Court has recognized that a writ of prohibition will lie to prohibit enforcement of an injunction where the court either did not have jurisdiction or exceeded its legitimate powers in issuing an injunction. *State ex rel. United Mine Workers of America, Local Union 1938 v. Waters*, 200 W.Va. 289, 489 S.E.2d 266 (1997). This case presents a claim that the lower court exceeded its legitimate powers by issuing an order which is clearly erroneous as a matter of law. "[T]his Court will use prohibition ... to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability ... [of reversal] if the error is not corrected in advance." Syl. Pt. 1, in part,

indoor air regulations restricting exposure to tobacco smoke.

**4.** By agreed order dated September 11, 2003, the preliminary injunction remains in effect in Kana-

wha County while any further action in the lower court is stayed until such time as this Court renders a decision on matters bearing on the K–C Board regulations.

*Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979).

In light of these standards, we proceed with our examination of issues raised.

## III. Discussion

### A. General Authority to Regulate

Eclipsing the resolution of the specific challenges the Boards raise to the orders of the lower courts are the general questions of the propriety and the extent of the Legislature's grant of authority to local boards of health with regard to clean indoor air regulations which restrict smoking in enclosed public places. Consequently, it is necessary to first examine relevant legislative enactments concerning authority of local health departments.

The powers and duties of local boards of health are set forth in West Virginia Code § 16–2–11 (2000) (Repl.Vol.2001), which provides in pertinent part:

(a) Each local board of health created, established and operated pursuant to the provisions of this article shall:

(1) Provide the following basic public health services and programs in accordance with state public health performance-based standards:

(i) Community health promotion including assessing and reporting community health needs to improve health status, facilitating community partnerships including identifying the community's priority health needs, mobilization of a community around identified priorities and monitoring the progress of community health education services;

(ii) Environmental health protection including the promoting and maintaining of clean and safe air, water, food and facilities and the administering of public health laws as specified by the commissioner as to general sanitation, the sanitation of public drinking water, sewage and wastewater, food and milk, and the sanitation of housing, institutions, and recreation; and

(iii) Communicable or reportable disease prevention and control including disease surveillance, case investigation and follow-up, outbreak investigation, response to epidemics, and prevention and control of rabies, sexually transmitted diseases, vaccine preventable diseases, HIV/AIDS, tuberculosis and other communicable and reportable diseases[.]

The authority to develop regulations to carry out these duties is set forth in subsection (b) of this statute as follows:

(b) Each local board of health created, established and operated pursuant to the provisions of this article may:

. . .

(3) Adopt and promulgate and from time to time amend rules consistent with state public health laws and the rules of the West Virginia state department of health and human resources, that are necessary and proper for the protection of the general health of the service area and the prevention of the introduction, propagation and spread of disease. All rules shall be filed with the clerk of the county commission or the clerk or the recorder of the municipality or both and shall be kept by the clerk or recording officer in a separate book as public records[.]

It is clear from the face of the statute that local boards of health have been granted express responsibility for "promoting and maintaining ... clean and safe air" which may include adoption and promulgation of "rules consistent with state public health laws and the rules of the West Virginia state department of health and human resources, that are necessary and proper for the protection of the general health of the service area and the prevention of the introduction, propagation and spread of disease." W.Va.Code § 16–2–11.

The Boards recognize that this grant of authority with regard to clean air does not expressly include smoking in enclosed public places, but they maintain that regulation of smoking is consistent with other public health laws which pointedly demonstrate the Legislature's concern with the risks associated with smoking. In support of this contention, the Boards cite West Virginia Code § 16–9A–1 (1987) (Repl.Vol.2001), which states:

The Legislature hereby declares it to be the policy and intent of this state to dis-

courage and ban the use of tobacco products by minors. As basis for this policy, the Legislature hereby finds and accepts the medical evidence that smoking tobacco may cause lung cancer, heart disease, emphysema and other serious health problems while the use of smokeless tobacco may cause gum disease and oral cancer. It is the further intent of the Legislature in banning the use of tobacco products by minors to ease the personal tragedy and eradicate the severe economic loss associated with the use of tobacco and to provide the state with a citizenry free from the use of tobacco.

*See also* W.Va.Code §§ 16–9B–1 (1999), 16–9C–1 (1999). We note that the C–H Board's regulation parallels this statutory language by stating as follows:

### Sec. 1001. Findings and Purpose

The Cabell–Huntington Board of Health does hereby find that:

Numerous studies have found that tobacco smoke is a major contributor to indoor air pollution, and that breathing secondhand smoke is a cause of disease, including lung cancer, in nonsmokers. At special risk are children, elderly people, individuals with cardiovascular disease, and individuals with impaired respiratory function, including asthmatics and those with obstructive airway disease; and

Health hazards induced by breathing secondhand smoke include lung cancer, heart disease, respiratory infection, and decreased respiratory function, including bronchoconstriction [sic] and bronchospasm.

Accordingly, the Cabell–Huntington Board of Health finds and declares that the purposes of this ordinance are (1) to protect the public health and welfare by prohibiting smoking in public places and places of employment; and (2) to guarantee the right of nonsmokers to breathe smokefree [sic] air, and to recognize that the need to breathe smokefree [sic] air shall have priority over the desire to smoke.

Similarly, the purpose set forth in the K–C Board's regulation provides:

### Section 1002. Findings and Purpose

The Kanawha–Charleston Board of Health does hereby find:

The United States Surgeon General and numerous other credible authorities and medical researchers have determined: (a) that involuntary inhalation of secondhand or environmental tobacco smoke can cause or contribute to numerous serious health problems and diseases, including heart disease, cancer and respiratory illness, and acute episodes of decreased respiratory function, including broncho-constriction and broncho-spasm in healthy nonsmokers; (b) that the presence of secondary tobacco smoke is a major contributor to indoor air pollution; (c) that children, elderly people and individuals with cardiovascular and/or respiratory disease, including asthmatics and those with obstructive airway disease are at special risk to exposures from secondhand tobacco smoke; (d) that the simple separation of smokers and nonsmokers within the same airspace may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke, and smoking bans remain the most viable and cost-effective method of protecting patrons.

Accordingly, the purpose of this regulation is to: (a) protect the health of the public by minimizing exposure of individuals to a proven harmful environmental toxin, i.e. secondhand smoke, while they engage in public indoor commerce; and (b) direct and/or strongly encourage the proprietors of public places of indoor commerce to provide a smoke-free environment to minimize public exposure to this harmful toxin.

The grant of rule-making authority contained in West Virginia Code § 16–2–11 is quite broad. Such a broad delegation of power is not necessarily impermissible, particularly in the area of health. In syllabus points two and three of *Quesenberry v. Estep,* 142 W.Va. 426, 95 S.E.2d 832 (1956), this Court found that the Legislature is the depository of the police power of the state and that the Legislature may delegate this discretionary authority to boards and commissions by providing adequate standards for the boards and commissions to follow.

Moreover, syllabus point four of *Quesenberry* addresses when less precise direction need accompany the grant of authority:

> The general rule, which requires an express standard to guide the exercise of discretion and applies to legislation regulating ordinary lawful activity, is subject to the exception that when it is impracticable to formulate a definite comprehensive rule or when the legislation relates to the administration of a police regulation and is necessary to protect the public health, morals, safety, and general welfare of the community, it is not essential that a specific prescribed standard be expressly stated in the legislation.

*Id.* at 426, 95 S.E.2d at 833. Even more pertinent to the issue currently under discussion is the reasoning we relied on in *Quesenberry* from a prior opinion of this Court in *State v. Bunner,* 126 W.Va. 280, 27 S.E.2d 823 (1943):

> [A]nother uniformly recognized exception to the general rule, by which the legislature is much less restricted [is] when its delegation of legislative authority is to an administrative body created for the care of public health.... [W]here the subject matter of the administrative authority is public health, the power is uniformly held not to originate in the Constitution, but from "the police power" .... Courts generally [ ] take the position that regulations and rules duly promulgated by a legally constituted board of health will be construed as valid wherever possible, if reasonably calculated to achieve the result intended by the legislature.

142 W.Va. at 443–44, 95 S.E.2d at 842–43 (citations omitted).

As aptly summarized in the purpose statements of the regulations at issue, significant scientific evidence suggests that smoking or exposure to second-hand smoke poses serious and substantial health risks. The opponents do not contest this proposition, no doubt because it defies common sense to review the literature in this regard—including the warnings appearing on every pack of cigarettes

sold—without concluding that direct and indirect exposure to tobacco smoke increases the likelihood, for smokers and nonsmokers alike, to develop chronic and acute illnesses which may prove life-threatening if not fatal. In attempting to minimize the effects of tobacco smoke on the general public in enclosed public places, the regulations of both Boards clearly address a serious health issue which the Legislature has recognized.

Finally, we take note of the fact that the boards of health covering forty-six counties in the state have adopted some species of indoor clean air regulation of tobacco smoke in public places over the years since 1993 when the first such regulation was adopted.[5] We note further that over these years, the Legislature has taken no steps to define any specific limitations on the power and discretion of the county boards of health to adopt orders restricting smoking in various public places.

■ Based upon the foregoing observations, we find that clean indoor air regulations of local boards of health that place restrictions on smoking in enclosed public places (1) are consistent with the findings of the Legislature "that smoking may cause lung cancer, heart disease, emphysema and other serious health problems," (2) advance the legislatively prescribed public policy "to provide the state with a citizenry free from the use of tobacco," and (3) fall within the bounds of authority granted by the Legislature to such boards. W.Va.Code § 16–9A–1. The aim of the regulations before us is not as comprehensive as the lofty legislative goal of having "a citizenry free from the use of tobacco," but the regulatory purpose, to protect the public health by prohibiting smoking in enclosed public places and places of employment, certainly corresponds with that broader legislative goal.

Having established the general authority of local boards of health regarding smoking regulations, we now proceed to consider the various constitutional challenges to the ex-

---

**5.** We are not informed of the exact number of different regulations in place in the forty-six counties but are aware that service areas of some

boards of health may encompass multiple counties or only have city-wide jurisdiction. *See* W.Va.Code §§ 16–2–4 and –5.

tent of this authority as advocated by the appellees and Mr. Dryden.

■ One argument raised by the opponents is that regulations which restrict smoking in such a way as to allow it in one establishment but ban it in another establishment in the same line of business represents a veiled exercise of eminent domain and constitutes a taking of private property without compensation in violation of West Virginia Constitution Article III, Section 9.[6] In our application of this constitutional provision to various situations involving land-use regulation, we have concluded that such regulation does not constitute an unconstitutional taking of property if the regulation can be reasonably found to promote the health, safety, morals, or general welfare of the public and the regulation does not destroy all economic use of the property. *McFillan v. Berkeley County Planning Comm'n.*, 190 W.Va. 458, 466, 438 S.E.2d 801, 809 (1993). Assuming *arguendo* that Article III, Section 9 may be applied to the property interests and regulations at issue, we find no constitutional violation because the legitimate state interest of public health is promoted by the regulation and all economic use of the property is not destroyed as a result of the regulation. *See also Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (unconstitutional taking under the Fifth Amendment to the United States Constitution occurs only if the land use "does not substantially advance legitimate state interests or denies an owner economically viable use of his land.")

■ The opponents next argue that indoor clean air regulations may not ban smoking in private areas such as offices and conference rooms without infringing on an individual's fundamental right to privacy, implicit in the due process clause of the state constitution. *See* W.Va. Const. art. III, § 10; *see also* U.S. Const. amend. XIV. The key here is whether a particular office or conference room is truly private. Where members of the public—including employees—are compelled to enter for the conduct of business or the performance of duties of

employment, we have no difficulty in finding that the office or conference area is indeed an enclosed public area to which a clean indoor air regulation may be applied. Likewise we recognize that a truly and exclusively private office, like one's own home, is beyond the scope of such a regulation. A person challenging the enforcement of a clean indoor air regulation based on an office or conference room being a truly private area bears the heavy burden of proving no member of the public, including employees, is at risk of being exposed to tobacco smoke by entering such location.

■ This leads us to Mr. Dryden's contention that a writ of prohibition should not issue in the Kanawha–Charleston case because the lower court correctly concluded that smoking regulations are not applicable to establishments holding retail liquor licenses because they have been legislatively designated private rather than public places. The Legislature has deemed such establishments to be "private places in which ... sale and consumption of intoxicating liquors are constitutionally permitted and authorized." W.Va.Code § 60–7–1 (1967) (Repl.Vol.2000). Article VI, § 46 of the West Virginia Constitution authorizes the Legislature to regulate the "sale of intoxicating liquors within the limits of this State" and requires that legislation authorizing such sales "forbid and penalize the consumption and the sale thereof for consumption in a saloon or other public place." *Id.* It is readily apparent that the constitutional reference to "public place" relates solely to alcohol consumption and sales. Likewise, the Legislature has expressly provided that the definition of "public place" contained in West Virginia Code § 60–1–5 (1967) (Repl.Vol.2000) was designed for purposes of that chapter, such chapter being entitled "State Control of Alcoholic Liquors." *Id.* Similarly, the application of the legislative definition of "private club" in West Virginia Code § 60–7–2 (1967) (Repl.Vol.2000) is restricted to the provisions of the article within the same chapter entitled "Licenses to Private Clubs." *Id.* We note, however, that, notwithstanding their designation as "private

6. Article III, Section 9 of the West Virginia Constitution provides in relevant part that "[p]rivate property shall not be taken or damaged for public use, without just compensation."

clubs," these establishments are subject to regular inspections for other purposes deemed necessary for the safety and health of the public, such as inspections for the cleanliness of kitchens and the proper handling of food sold on the premises or compliance with fire code requirements. Thus, we find no constitutional or legislative bar to such establishments being subject to the provisions of smoking regulations, or any other type of health or safety regulation, solely because they are licensed to sell alcoholic beverages. Based upon this legal conclusion, the preliminary injunction resulting from the July 24, 2003, order of the Circuit Court of Kanawha County, in which enforcement of any portion of the K–C Board regulation in any facility that is licensed to serve alcoholic beverages and/or beer, cannot stand.

The remaining constitutional arguments raised by the opponents involve particular provisions of the regulations at hand, making it more appropriate to address them within the section following.

## B. Validity of Specific Regulations

 Having determined that local health boards have the general authority to promulgate smoking regulations, we turn to a closer examination of the clean indoor air acts in each of the cases sub judice to ascertain whether the Boards exceeded their authority in formulating the particular provisions of their regulations. We have recognized that delegation of the police power vested in the legislative branch of government is "subject only to the control of the courts, to the extent that they may properly act." *Hayes v. Town of Cedar Grove*, 126 W.Va. 828, 839, 30 S.E.2d 726, 732 (1944). Parallel to the sentiments quoted from *State v. Bunner* in *Quesenberry*, we noted in *Hayes* that courts should be "reluctant to place limits on what may be done in the interest of the health of a community, so long as unreasonable methods are not employed, nor the natural and constitutional rights of citizens invaded." 126 W.Va. at 839, 30 S.E.2d at 732. *See also, Miller–Todd Coal Co. v. State Compensation*

*Comm'r.*, 115 W.Va. 326, 328, 175 S.E. 856 (1934) (regulations necessary to protect the public morals, health, safety and general welfare will ordinarily be upheld if they are not arbitrary or unreasonable). Consequently, judicial review of health regulations dealing with smoking in enclosed public places involves a three-prong inquiry: (1) whether the methods provided in the regulation are reasonably related to the public policy goal of a society free from tobacco use; (2) whether the regulatory measures are drafted or applied in a manner which is arbitrary or unreasonable; and (3) whether the regulations impermissibly invade the constitutional rights of citizens.

 The appellees in the Cabell–Huntington case contend here as they did below that the regulations adopted by the C–H Board are unconstitutional because they usurp legislative power, in violation of Section 1, Article VI of the West Virginia Constitution,[7] by creating a criminal law and penalty and by attempting to regulate smoking in places where state statutes or regulations permit the activity. The lower court based its invalidation of the C–H Board's Clean Indoor Air Regulation of 2001 upon the finding that the regulation impermissibly created a criminal law and penalty. The following represents the findings of the court below in this regard:

> The legislature may not delegate authority to enact criminal laws to an agency which is a unit of the executive branch of State government. Syllabus Point 2, *State v. Grinstead*, 157 W.Va. 1001, 206 S.E.2d 912 (1974). *See also, State ex rel State Line Sparkler of WV, Ltd. v.[sic] Teach*, 187 W.Va. 271, 276, 418 S.E.2d 585, 590 (1992), *Butler v. Tucker*, 416 S.E.2d 262, 268, 187 W.Va. 145, 151 (1992) (Both discuss and reaffirm *Grinstead*.).

> The Cabell–Huntington Board of Health is a division of an executive department of the State, the Department of Health and Human Resources. West Virginia Code § 16–2–11 (2001)[sic].

---

**7.** Article VI, Section 1 of the West Virginia Constitution provides, in part: "The legislative pow-

er shall be vested in a senate and house of delegates."

The sanctions set forth in the regulation are criminal, and not civil.

The Cabell–Huntington Board of Health may impose sanctions of a civil nature, such as closure of a regulated business for exposure to dangerous substances.

It is apparent that the lower court relied heavily on our decision in *Grinstead* in reaching its conclusion. In *Grinstead,* this Court considered a challenge to West Virginia Code § 16–8B–1, which proscribes the possession or sale of dangerous drugs, as an unlawful delegation of law-making authority to the West Virginia Board of Pharmacy. The central issue in *Grinstead* was a provision in West Virginia Code § 16–8B–1(d) which authorized the Pharmacy Board to expand a list of proscribed drugs by automatically adding substances designated as dangerous or habit-forming in accordance with existing or future federal drug regulations. We ultimately determined that the Legislature could not empower the Board of Pharmacy to engraft future declarations of unlawful conduct by other bodies onto the present statute because under Article VI, Section 1 of the West Virginia Constitution a statute is "invalid as incomplete if it is left to a body other than the Legislature to determine without benefit of legislative standards what shall and shall not be an infringement of the law." 157 W.Va. at 1010, 206 S.E.2d at 918. We thereafter said that it is an unlawful delegation of legislative power for the Legislature to delegate "so loosely as to permit another legislative body or an executive board or agency to redefine and expand … criminal acts *in futuro* and without limitation." *Id.* at 1011, 206 S.E.2d at 919.

It is important to note that in *Grinstead,* the remaining subsections of West Virginia Code § 16–8B–1 were found to be constitutionally sound because they contained "adequate standards and limitations to protect the delegation of legislative prerogatives." *Id.* As we established earlier in our discussion of proper delegation of rule-making authority pursuant to the Legislature's police power, the standard established by the Legislature with regard to clean indoor air regulations is to have "a citizenry free from the use of tobacco." W.Va.Code § 16–9A–1. The Legislature clearly empowered local boards of health with the authority to "[a]dopt and promulgate and from time to time amend rules consistent with state public health laws and the rules of the West Virginia state department of health and human resources, that are necessary and proper for the protection of the general health of the service area and the prevention of the introduction, propagation and spread of disease." W.Va.Code § 16–2–11(b)(3). The Legislature also provided a mechanism to enforce violations of the regulations by providing that "[a]ny person who willfully violates … any of the rules or orders adopted or issued pursuant to the provisions [of this article], for which a penalty is not otherwise provided, is guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not less than two hundred dollars and not more than one thousand dollars." W.Va.Code § 16–2–15. Hence, reading these sections together, as expressly directed in West Virginia Code § 16–2–15, it is obvious that the Legislature not only established that regulations of this nature may be promulgated but also deemed violation of such regulations to be enforceable in a criminal proceeding. Our review of the penalty section of the regulation [8] leads

---

**8.** The penalty section of the Cabell County Clean Indoor Air Regulation of 2001 states in its entirety:

*Sec. 1011. Violations and Penalties*

A. It shall be unlawful for any person who owns, manages, operates or otherwise controls the use of any premises subject to regulation under this article to fail to comply with any of its provisions.

B. It shall be unlawful for any person to smoke in any area where smoking is prohibited by the provisions of this article.

C. Any person who violates any provision of this article shall be guilty of an infraction of Chapter 16 of the West Virginia State Laws. Penalty will be as set forth by Chapter 16–2–15 of the west Virginia State Laws which states:

**§ 16–2–15. Obstructing local health officers and others in the enforcement of public health laws; other violations; penalties.**

Any person who willfully obstructs any local health officer, public health nurse, sanitarian or any other person charged with the enforcement of any public health law, in the performance of that person's legal duties in enforcing the law, is guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not

us to conclude that, rather than unconstitutionally usurping legislative authority, the C–H Board's recitation of the legislatively defined penalty in its regulation merely provides notice of the legislatively defined penalty and is not the creation of a new crime and penalty.[9]

The next claim of infringement of legislative power raised by the appellees in the Cabell–Huntington case is that the regulation conflicts with existing statutes and a state regulation which allow smoking. The specific laws to which appellees direct our attention are: West Virginia Code § 8–27–10a (1985) (smoking restrictions applicable to certain vehicles used to transport the public); § 16–9A–4 (1987) (limitations on smoking in public schools); § 21–3–8 (1919) (no smoking in places of employment when so posted); § 22A–2–30 (1985) (smoking prohibited near surface magazines for explosives used in mining); § 22A–2–53 (1985) and 22A–2–53c (1994) (smoking restrictions in and around structures of mines); § 47–20–28a (1993) (smoking restrictions in bingo halls); and 64 W.Va.C.S.R. § 14, 8.12.3. (smoking in personal care homes) (1996).

■■■ Without question, the regulatory authority of local boards of health is limited by statute to be "consistent with state public health laws and the rules of the West Virginia state department of health and human resources." W.Va.Code § 16–2–11(b)(3). In this regard, regulations adopted by local boards of health are analogous to municipal ordinances, which are "inferior in status and subordinate to legislative acts." *Am. Tower Corp. v. Common Council of the City of Beckley,* 210 W.Va. 345, 349, 557 S.E.2d 752, 756 (2001) (quoting *Vector Co. v. Board of Zoning Appeals,* 155 W.Va. 362, 367, 184

S.E.2d 301, 304 (1971)). Such subordination to "the predominant power of the State, when that power has been exercised[,] . . . [is necessary to avoid] serious confusion, and ofttimes absurd results." *Brackman's, Inc. v. City of Huntington,* 126 W.Va. 21, 35, 27 S.E.2d 71, 78 (1943). Thus we find that in order to be in consonance with the limitations set forth in West Virginia Code § 16–2–11, regulations adopted by local boards of health, being inferior in status and subordinate to legislative acts, cannot contradict state statutes or properly promulgated state regulations. With this in mind, we first examine the sole state regulation identified, reserving the cited statutes for separate consideration.

■■■ The state regulation to which the appellees in the Cabell–Huntington case direct our attention as an exception to the clean indoor air regulations is a provision of the State Board of Health's personal care home licensure rule which states that "[p]ersonal care homes shall have non-smoking areas and may adopt no-smoking policies. Current residents who smoke shall not have smoking privileges terminated through a no-smoking policy." 64 W.Va.C.S.R. § 14, 8.12.3. (1996). We take judicial notice that this regulation was superseded by an emergency rule promulgated under the authority of West Virginia Code § 16–5D–17 (2003), and combines the standards for two former levels of care, personal care homes and residential board and care homes. The new state regulation, entitled "Assisted Living Residences," became effective September 4, 2003, and does not contain a provision regarding smoking privileges. *See* 64 W.Va. C.S.R. § 14 (2003). Consequently, the local clean indoor air regulations may not be applied to residents of personal care homes

---

less than fifty dollars and not more than five hundred dollars.

Any person who willfully violates any of the provisions of this article, or any of the rules or orders adopted or issued pursuant to the provisions, for which a penalty is not otherwise provided, is guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not less than two hundred dollars and not more than one thousand dollars.

Magistrates have concurrent jurisdiction with the circuit courts of this state for violations of provisions of this article.

We note that the Kanawha–Charleston regulations contain a similar penalty section.

9. We also find no merit to the contention that a conflict between the penalties imposed within some of the cited statutes and those contained in the C–H Board's clean air regulation poses any problem to validating the regulation. By incorporating the language of West Virginia Code § 16–2–15, the regulation plainly establishes that the enforcement provision only applies to conduct "for which a penalty is not otherwise provided" by law. *Id.*

who had smoking privileges under the former regulation. In other words, the smoking privilege afforded those individuals who were residents of personal care homes before September 4, 2003, are grand-fathered into the superceding regulation.

█ With regard to the questioned statutes, we initially observe that none of the statutes to which we are directed establish a right to smoke. Further, of the referenced statutes, only the charitable bingo law expressly permits smoking. This statute specifically states that "[a]ny bingo operator who distributes more than one hundred bingo cards or bingo sheets at any bingo occasion shall provide a smoking and nonsmoking section, if smoking is permitted." W.Va.Code § 47–20–28a. A fair reading of the statute leads us to conclude that the provisional clause, "if smoking is permitted," places the choice of restricting smoking at bingo games of this nature with the operator because the concomitant obligation to provide accommodation rests on the operator. *Id.* As a consequence, regulations of local boards of health limiting smoking in enclosed public places must respect the quantity and ventilation requirements of West Virginia Code § 47–20–28a.

Of the remaining enumerated statutes, we are not shown, nor do we find any legislative intent, either express or implied, to prohibit further regulation in the denoted locations. Three of the referenced statutes create strict limitations for smoking around mining structures as a safety measure. *See* W.Va.Code §§ 22A–2–30, –53, –53c. The remaining statutes at least appear to limit or otherwise restrict smoking in certain locations on the basis of public health concerns, but none of the statutes suggests a legislative intent to preempt the development of complimentary measures to regulate smoking by local boards of health. While a statute and the regulation may share a common element, we do not think this is enough to conclude that the Legislature intended to preempt local regulation.[10] Other courts faced with a comparable question have reached a similar con-

clusion. *See e.g. City of Tucson v. Grezaffi,* 200 Ariz. 130, 23 P.3d 675 (2001) (the state smoking restriction statutes did not reflect express or implied legislative intent to so occupy the field that no room was left for any supplementary or additional local regulation); *Tri–Nel Management v. Board of Health of Barnstable,* 433 Mass. 217, 741 N.E.2d 37, 44 (2001) (state statutes prohibiting smoking in various locations and restricting smoking in restaurants did not preempt or conflict with municipal regulation prohibiting smoking in all restaurants and bars because local ban "furthers, rather than frustrates, [state legislative] intent"); *Boreali v. Axelrod,* 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987) (state statute that restricted smoking for narrow class of public locations did not preempt field of indoor smoking regulation); *Oregon Restaurant Ass'n. v. City of Corvallis,* 166 Or.App. 506, 999 P.2d 518 (2000) (state's "Indoor Clean Air Act" did not preempt municipal ordinance prohibiting smoking in enclosed public spaces within city when no clear inconsistency or conflict existed between Act and ordinance). *Cf. Michigan Restaurant Ass'n. v. City of Marquette,* 245 Mich.App. 63, 626 N.W.2d 418 (2001) (local ordinance that completely banned smoking in restaurants within city directly conflicted with restaurants' right under state statute "to designate a certain percentage of its seating capacity as seating for smokers"); *LDM, Inc. v. Princeton Regional Health Comm'n,* 336 N.J.Super. 277, 764 A.2d 507, 526 (2000) (local smoking ordinance preempted by state law that established pervasive, comprehensive, and exclusive scheme regulating "when, where, and under what circumstances smoking is allowed").

In addition to the statewide bingo and personal care home exceptions we have thus far discussed, the regulations of both Boards internally list exceptions applicable to their respective service areas. The smoking regulation opponents contend that any provision which excepts from its operation some but not all of a group of business falling within

**10.** *See* W.Va.Code § 16–9A–5 (1987) (Repl.Vol. 2001) regarding billboard advertisements for smokeless tobacco as an example of the Legisla-

ture's clear intent to ban further state or local regulation.

the same classification offends equal protection principles.

The concept of equal protection of the laws is inherent in the due process clause, Article III, Section ten of the West Virginia Constitution. Syl. Pt. 3, *Robertson v. Goldman*, 179 W.Va. 453, 369 S.E.2d 888 (1988). "Equal protection of the law is implicated when a [legislative] classification treats similarly situated persons in a disadvantageous manner." Syl. Pt. 2, in part, *Israel v. West Virginia Secondary Schools Activities Commission*, 182 W.Va. 454, 388 S.E.2d 480 (1989). Our review of matters sounding in equal protection is dependent upon a balancing of the interests at stake. When a measure involves a suspect class or a fundamental right, in order to withstand an equal protection challenge, the classification must be necessary in order to protect a compelling state interest. *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991). In instances like that before us where equal protection claims concern economic rights, "we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally." Syl. Pt. 7, in part, *Atchinson v. Erwin*, 172 W.Va. 8, 302 S.E.2d 78 (1983). Equal protection principles in such cases are not violated where the classification is rational and bears the requisite reasonable relationship. *Id.*

The particular exceptions which the opponents claim represent equal protection violations are those involving bars and racing/gaming facilities. While different treatment may be accorded within the classifications identified by the opponents, all bars and racing/gaming facilities having the characteristics *defined within the regulations* are treated in the same manner. For example, in the Cabell–Huntington service area, smoking is permitted in all free-standing bars having eighty percent of gross sales derived from alcoholic beverages; in the Kanawha–Charleston service area, smoking is allowed in all dog and horse racing track facilities licensed by the West Virginia Racing Commission and at all gaming facilities licensed by the West Virginia Lottery Commission. We cannot say, nor has any party explicitly shown, that the various classifications defined within each set of regulations has no rational basis in social, economic, historic or geographic factors. It is more likely that these factors have influenced the incremental manner by which the Boards have proposed to eventually eradicate tobacco smoking in all enclosed public places within their respective service areas. We recognize and respect the need for governmental flexibility in addressing serious health concerns when significant changes to established societal practices such as smoking are undertaken. From this vantage point, the measured approaches represented in each of the regulations not only represent acceptable classifications, but also bear a reasonable relationship to the overall governmental purpose of attaining the legislative goal of a citizenry free from tobacco use. Accordingly we cannot conclude that the regulations at hand offend the equal protection provision in the due process clause of our state constitution.

While we have found the constitutional challenge to the exceptions without merit, we have yet to determine whether the exceptions are reasonable in relation to the public policy goal, as well as whether or not they are arbitrary or unreasonable in their application. The number and variety of exceptions in the regulations before us is noteworthy: one of the regulations lists five exceptions while the other has six, and there is a total of seven different subjects listed between the two regulations. Even where exceptions relate to a common subject, there are subtle differences as to how, when or where they apply. For example, there is a "bar exception" in both regulations which applies to establishments in which food service is only incidental to alcohol consumption; however, one regulation excepts bars realizing eighty percent or more of total gross sales from alcoholic beverages, whereas the other regulation exempts bars having eighty percent or greater of its total sales, excluding lottery sales, in alcoholic beverages. At first blush, the distinctions and differences may appear arbitrary, yet we are mindful

that the Boards have developed the subject regulations against the backdrop of their local service areas. As stated in the Kanawha County regulations, "smoking regulations are primarily self-regulating through public pressure." It thus becomes apparent that there is an enhanced need for local boards of health to consider the unique concerns and characteristics within the confines of their jurisdiction in order to meet the overriding goal of a smoke-free society. Consequently, it would be far more surprising if each board would have chosen the same incremental steps to achieve the common statewide goal. We imagine that such differences, both in subject matter and in application of such exemptions, are common among the various regulations which are in place in forty-six of the state's fifty-five counties. While we could undertake an examination of each exception in light of the local conditions and circumstances, we find such a task to be unnecessary. First and foremost, no evidence has been presented that individual regulations have been developed in an arbitrary or unreasonable manner. Secondly, we refuse to impose our will upon the local entities which the Legislature has deemed to have broad authority to develop the regulations, including relevant exceptions. Thirdly, we see no merit in placing a cloud on the validity of the remaining indoor smoking regulations in effect in the majority of the state by opening the door to reexamination of all smoking regulation exceptions. Without doubt, the Legislature has the power to develop uniform standards for exceptions to the smoking regulations and is the proper constitutional body to look to for direction in this regard. We earlier acknowledged this power with regard to the legislatively prescribed bingo exception. The time may well be ripe for the Legislature to examine the various regulations in place along with health, economic and other relevant factors in order to establish uniform and coherent standards for the local boards of health to follow, which would in turn serve as a solid and consistent basis from which judicial determinations of reasonableness may be made. Given the breadth of such an undertaking, it appears to be an ideal subject for the Legislature's interim study.

In summary, we find that the Circuit Court of Cabell County erred as a matter of law by invalidating the Cabell–Huntington clean indoor air regulation on the basis that the C–H Board exceeded its authority by enacting a criminal law and penalty. We further find that the regulations of both Boards are reasonably related to the public policy goal of a society free from tobacco use and also are reasonable in the manner in which they were drafted. Nonetheless, the provisions of the Cabell–Huntington and Kanawha–Charleston regulations must comply with our finding that all existing clean indoor air regulations in the state honor: (1) the legislative bingo exception in West Virginia Code § 47–20–28a; and (2) the smoking privilege afforded certain personal care home residents who resided in such homes before September 4, 2003, when the former state regulation governing personal care home licensing was in effect.

## C. Cross Assigned Error: Open Governmental Meetings Act

The remaining issue raised by the appellees in the Cabell–Huntington case is a cross-assignment of error relating to the lower court's determination that the C–H Board did not violate the Open Governmental Proceedings Act. Since this matter involves review of a factual determination of the court below, we apply a clearly erroneous standard. *Weaver v. Ritchie*, 197 W.Va. 690, 693, 478 S.E.2d 363, 366 (1996).

The appellees contend that the C–H Board held a secret meeting on October 31, 2001, at which substantial modifications to the regulations were made. The appellees state that "[t]his meeting was a private meeting, with intentions of transacting public business, thwarting public scrutiny and making decisions that eventually would become official action." The C–H Board's response is that the meeting of the C–H Board on October 31, 2001, was for educational purposes and did not involve deliberation toward a decision or a vote. The C–H Board surmises that since general discussion in a planned educational setting, without the intent to conduct business, is not considered

a meeting under the Open Governmental Meetings Act, West Virginia Code § 6–9A–2(4)(D) (1999) (Repl.Vol.2003),[11] the lower court correctly found that no violation had occurred under the facts of this case.

The ruling of the lower court in its February 18, 2002, order on this matter states: "The meeting held on the 10th day of October 2001 by the Cabell–Huntington Board of Health was for educational purposes and did not violate the open meetings act. West Virginia Code § 6–9A–2(4)(D) (2000)[sic]." Even though the lower court's order contains no explanation as to the basis for this conclusion, we note that the record contains an affidavit of Omayma T. Touma, M.D., Medical Director of the Cabell–Huntington Health Department, stating the following about the October 31, 2001, meeting, based on her personal knowledge:

4. That, on October 31, 2001, the Cabell–Huntington Board of Health held a general discussion session with two members of the Tobacco Prevention Program concerning the proposed Cabell County Clean Indoor Air Regulation of 2001.

5. That the members of the Board of Health in attendance considered the October 31, 2001, discussion to be only educational or training in nature. Suggested modifications were not voted upon at that time.

6. That the members of the Board of Health in attendance did not intend during the October 31, 2001, discussion to conduct public business in the form of a vote on the Regulation.

7. That no vote was in fact taken concerning the passage of the Regulation during the session of October 31, 2001.

We cannot say that the lower court's decision was clearly erroneous since there was evidence in the record that supported the factual conclusion. Consequently, the ruling of the lower court is affirmed on this issue.

---

11. West Virginia Code § 6–9A–2(4)(D) provides in relevant part:
 (4) "Meeting" means the convening of a governing body of a public agency for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter which results in an official action.... The term meeting does not include:
 . . .

## IV. Conclusion

In accordance with the foregoing, the clean indoor air regulations of the Cabell–Huntington and the Kanawha–Charleston Boards of Health may be enforced, subject to the exceptions of West Virginia Code § 47–20–28a and the former state regulation governing personal care home licensure. As a consequence, the February 18, 2002, order of the Cabell County Circuit Court is reversed to the extent it invalidated the local board of health's clean indoor air regulation but is affirmed with regard to the open governmental meeting ruling. In the Kanawha–Charleston case, we grant the writ of prohibition, as moulded.

No. 31120—Reversed in part, affirmed in part.

No. 31616—Writ granted, as moulded.

(D) General discussions among members of a governing body on issues of interest to the public when held in a planned or unplanned ... educational, training ... or similar setting, without intent to conduct public business even if a quorum is present and public business is discussed but there is no intention for the discussion to lead to official action ....